P8MRFLYc

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   FLYCATCHER CORP. LTD., et al.,

 4                  Plaintiffs,

 5          v.                              24 Civ. 9429 (KPF)

 6   AFFABLE AVENUE LLC, et al.,
                                            Conference
 7
                Defendants.
 8
     ------------------------------x
 9                                          New York, N.Y.
                                            August 22, 2025
10                                          10:15 a.m.

11   Before:

12                   HON. KATHERINE POLK FAILLA,

13                                          District Judge

14                           APPEARANCES

15   KOFFSKY SCHWALB LLC
          Attorneys for Plaintiffs
16   BY:  EFREM TOBIAS SCHWALB

17   STEVEN ANDREW FELDMAN
          Attorney for Defendant Affable Avenue LLC
18
     MANDELBAUM BARRETT PC
19        Attorneys for Defendant Top Experience Company, LLC d/b/a
     We Pay Cost LLC
20   BY:  BRIAN BLOCK
          JOEL GEOFFREY MacMULL
21
     SCARINCI HOLLENBECK
22        Attorneys for Defendant Joshua Chavez d/b/a
     Onestopfastshop
23   BY:  DAN BRECHER (via Teams)

24   LOZA & LOZA, LLP
          Attorneys for Defendant Valley Bodega Wholesale Inc.
25   BY:  ERYN YEE KWAI TRUONG (via Teams)
```

P8MRFLYc

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P8MRFLYc

| 1 | (Case called) |

MR. SCHWALB:  Good morning, your Honor.  Efrem Schwalb
from the law firm of Koffsky Schwalb on behalf of plaintiffs,
Flycatcher Corp. Ltd. and Flycatcher Toys, Inc.

THE COURT:  Sir, thank you, and good morning.

My friends, may I start please with you, sir?  Thank
you.

MR. FELDMAN:  Steven Andrew Feldman appearing on
behalf of Affable Avenue.

THE COURT:  Thank you, sir, and good morning to you.

And you, sir?

MR. SCHWALB:  Good morning, your Honor Brian M. Block
from the law firm of Mandelbaum Barrett for Top Experience LLC.

THE COURT:  Thank you so much.

And sir?

MR. MacMULL:  Good morning, your Honor.  Joel MacMull
on behalf of Top Experience as well.  It's nice to see you
again.

THE COURT:  Good to see you both.  Is one of you
taking the lead this morning?

Mr. MacMull, your colleague, Mr. Block just pointed to
you, so I think it's you.

MR. MacMULL:  I think he's right.

THE COURT:  Thank you so much.

I understand I have as well some folks on the line.

P8MRFLYc

1    Do I have — is it — Eryn Truong on Teams?

2              MS. TRUONG:  Yes.  Good morning, your Honor.  This is

3    Eryn Truong of the law firm of Loza & Loza representing

4    Defendant Valley Bodega Wholesale Inc.

5              THE COURT:  Thank you so much.

6              And I believe as well, do I have also — I believe

7    it's Brecher — Dan Brecher?

8              MR. BRECHER:  Yes, your Honor.  It's Dan Brecher

9    representing the Defendant Joshua Chavez.

10             THE COURT:  Thank you very much.  So good morning to

11   all of you, and thank you for coming in this morning.  We're

12   here because of an order to show that I previously issued

13   concerning certain submissions filed on behalf of Affable

14   Avenue by Mr. Feldman.  From my perspective, what I would like

15   to do this morning is to speak at length with Mr. Feldman about

16   what happened with some of the submissions.

17             So I think the best way for me to do that is I am

18   going to ask you, Mr. Feldman, I'm going to ask you a lot of

19   questions.  I don't know that I'm going to permit the other

20   attorneys to speak.  I hope I'll be comprehensive, but you'll

21   tell me if there's something that I missed.  Mr. Feldman,

22   because I'm asking all of these and because I see you have a

23   lot of notes in front of you, I'll let you, please, remain

24   seated as you are answering the questions.  But in the interest

25   of good order, I'll ask my deputy to place you under oath.

P8MRFLYc

```
 1                     (Steven Andrew Feldman affirmed)

 2                Sir, thank you so much.  Please be seated.

 3                Mr. Feldman, I understand that you represent Affable

 4    Avenue in this case.  In that capacity, are you working with

 5    any other attorneys on this matter for Affable Avenue?

 6                MR. FELDMAN:  No.  I am not working with any other

 7    attorneys.

 8                THE COURT:  Thank you, sir.

 9                MR. FELDMAN:  Let me ask you a clarifying question.

10    When you say "any other attorneys," what does that mean?

11                THE COURT:  You're right.  I'll ask a better question.

12    Let's do it this way:  Your firm was retained to represent the

13    defendant Affable Avenue in this case, is that correct?

14                MR. FELDMAN:  That is correct.

15                THE COURT:  Do you have associates who work with you

16    in your firm, or is it just you at the firm?

17                MR. FELDMAN:  I have associates who do work with me on

18    particular cases.  In this particular matter, there is no

19    associate involved in this case.

20                THE COURT:  Thank you.  And is any other lawyer from

21    any other law firm assisting you with this representation in

22    this case?

23                MR. FELDMAN:  I have sought counsel from other

24    attorneys in this matter.  I've conferred with other counsel

25    throughout, but in terms of representing Affable directly, I am
```

P8MRFLYc

1     the only person who represents Affable in this matter.

2             THE COURT:  And I should be clear —— I'm sure you know

3     this —— I'm not interested in seeking your privileged

4     communications about the case.  I just want to make sure I'm

5     getting a complete picture of what is going on.

6             When you say you've consulted other attorneys, is that

7     sort of discussions of the legal issues in the case, or are

8     they providing legal research or writing for you in any of

9     these matters?

10            MR. FELDMAN:  So actually the answer is yes, actually.

11    So in this particular case, I have had several -- again, I'm

12    not going to go into the substance of the discussions because

13    those would be confidential, as your Honor said.

14            THE COURT:  Of course.

15            MR. FELDMAN:  But on multiple occasions, I have

16    reached out to counsel to -- well, it's two components.  One

17    component is the substance of the case in terms of the actual

18    litigation theory, some of the underlying substantive matters

19    of the case, as well as the procedural aspects of the case at

20    the beginning of the case when the case was first brought to my

21    attention.  So there are different layers, and in terms of the

22    ethical aspects of the case, obviously there are other counsel

23    that were addressed.

24            When Mr., for example, MacMull and I had several

25    discussions in terms of strategy and how to handle the case,

P8MRFLYc

1    obviously privileged or at least he said it was privileged,

2    those privileged discussions were somewhat substantive.  And at

3    that point in time, it became clear that Mr. MacMull and I had

4    a clear conflict in terms of our positions on the case, and as

5    such, I was -- as such, I was unable to rely on him for

6    anything substantively, although we could still have

7    conversations on the case.  So I had to stop consulting with

8    him on the case.

9              THE COURT:  I'm a little puzzled by the term

10   "consulting with him."  Obviously he represents another

11   defendant in the case, and to the extent that there are common

12   legal issues that each of you is facing, I could understand

13   that you might discuss and you might say, does this make sense

14   as a defense in the case or things of that nature.  Obviously,

15   he cannot assist you — unless you think he can — with the

16   drafting of legal submissions in this matter.

17             MR. FELDMAN:  So yes.  So I would definitely agree

18   with that part.  However, I would parse that into two different

19   things.

20             THE COURT:  OK.

21             MR. FELDMAN:  So there's about four different levels

22   of cooperations in terms of actual legal writing that attorneys

23   can do.  The first level of cooperation is just talking about

24   the overall strategy in terms of whether we're going to align

25   our submissions.  So for example, opposing counsel can

P8MRFLYc

1    potentially agree with non-opposing counsel that we're going to

2    go with a certain line of the case because it works for us to

3    get a favorable judgment, you know, success, right?

4               THE COURT:  Of course.

5               MR. FELDMAN:  And that happens all the time and there

6    are ethical issues with that.  I'm not dealing with that in

7    this case personally.

8               Then there's, in terms of coordinating, we can also

9    talk frankly about our agreed positions.  And then when it

10   comes to agreed positions, we could say, hey, I'm just going to

11   go and like me too your submission or I'm not going to me too

12   your submission.  And each counsel is responsible for their own

13   submissions, but if I am me-too-ing it, then obviously I have a

14   responsibility.  And to that end, Mr. MacMull and I had an

15   initial discussion about the matter.

16              In the beginning, we were actually, you know,

17   cooperating almost on a more minute level in terms of

18   discussing how we would address particular letters to the

19   Court.  For example, there was a situation where there was a

20   very large submission submitted to the Court by plaintiff's

21   counsel, and Mr. MacMull, you know, in correspondence said,

22   hey, why don't you win on the merits, kind of thing; like, why

23   do you have to do this?

24              Those kinds of correspondence that we had together, I

25   agreed with him in terms of obviously this should be won on the

P8MRFLYc

1  merits.  But in terms of the actual focus of the legal

2  arguments that, again, did not cross the line into preparing

3  documents, it was, hey, I agree with you, and I submit -- and

4  in my letter to the Court, I wrote my response.  I said like I

5  concur with his position.

6          THE COURT:  OK.  I'm going to ask you to speak a

7  little slower for the court reporter and Judge just so I can

8  take better notes.  Thank you.

9          MR. FELDMAN:  Yes, your Honor.

10          THE COURT:  Now, was that the third level of

11  cooperation that you were talking about?

12          MR. FELDMAN:  No.  That's still the first level.

13          THE COURT:  We're still on level one.

14          MR. FELDMAN:  Level one, which is, I would say, the

15  strategic coordination.

16          THE COURT:  OK.  Have we exhausted level one?  I just

17  want to know what two, three, and four are.

18          MR. FELDMAN:  All right.  I can anticipate questions,

19  so I apologize.  So I'm trying to focus on what I think is the

20  best view, in my belief, since I am trying to be as accurate as

21  possible.

22          THE COURT:  Of course.

23          MR. FELDMAN:  And since this is a theory that I have,

24  I'm presenting it as best as I can on the fly.

25          THE COURT:  Of course.

P8MRFLYc

1          My point, sir, is you said to me at some point that

2     there were four levels of cooperation that attorneys can do.

3     And then you talked about discussions of overall strategy

4     positions and the possibility of me-tooing arguments.  I did

5     not know whether those were three things or one thing.  You've

6     now told me they are one thing.  For my own completeness, may I

7     know if, I'm allowed to, what levels two, three, and four are

8     in your four levels of cooperation?

9          MR. FELDMAN:  So if I can explain, so the last one we

10    talked about, which is the me too part --

11          THE COURT:  Yes, sir.

12          MR. FELDMAN:  That crosses the line into number two.

13          THE COURT:  I see.  OK.  And then three and four?

14          MR. FELDMAN:  Three and four would be substantive

15    arguments in terms of ─── let's say ─── drafting a certain part

16    of the complaint and someone, you know, basically either

17    dittoing it essentially, which is me-tooing it, and me copying

18    it, actually copying it.  And then there's the other part,

19    which is conferring with counsel, and requesting whether it's

20    courtesy copies of a case that seem to make no sense or seem to

21    have an issue, or vice versa telling other counsel, hey, you

22    made a mistake over year; it's going against our strategy;

23    maybe you want to fix it.

24          So that's a coordination that does go to the substance

25    of the work and does go to the underlying case.  That's where

P8MRFLYc

1    the, sort of, conflict of interest starts coming up, which is

2    if interests of the two parties don't align, there are subtle

3    arguments that each one may be making that don't align and

4    therefore the coordination at that point starts becoming much

5    more fraught with consideration, and you have to sort of, I

6    guess, tread more lightly in terms of how you cooperate and how

7    you work together.

8            So in this particular case, in terms of the second

9    level, we did coordinate in terms of discussing the strategy in

10   terms of our positioning.  I can't disclose those things

11   because again I don't --

12           THE COURT:  Of course, and I'm not asking you to.

13           MR. FELDMAN:  But I will say a significant point of

14   contention without substance was a significant part of my line

15   of -- my lining of reasoning in the case.  And that particular

16   part of the case took a turn into the more substantive part,

17   which is where I'll get into the next level, which is in that

18   point.  So --

19           THE COURT:  Sir, let me ask you to pause for a moment,

20   and let me ask more bite-sized questions.

21           MR. FELDMAN:  Sure.

22           THE COURT:  There came a point in time where you

23   decided to file a motion to dismiss the third amended

24   complaint, yes?

25           MR. FELDMAN:  Yes.  That's right.

P8MRFLYc

1          THE COURT:  How did you go about preparing that

2    memorandum?

3          MR. FELDMAN:  So I had two memorandums.

4          THE COURT:  OK.

5          MR. FELDMAN:  I did a first memorandum which focused

6    on the standard outline that we outlined in the initial -- in

7    my letter briefing as well as in response to plaintiff's

8    submissions in their opposing letter.

9          THE COURT:  I see.  So your initial motion to dismiss

10   was both the explication of your affirmative arguments and an

11   attempt to anticipate, based on the plaintiff's premotion

12   submissions, what their arguments were going to be?

13         MR. FELDMAN:  Correct.  And to that end, those

14   involved, I think it was -- I don't remember exactly how many

15   cases, but I would say that it was somewhere -- if it was about

16   60 cases, I wouldn't be an exaggeration.  And that was my

17   initial corpus of case law that I was originally utilizing for

18   preparing my outline.

19         THE COURT:  Right.  You said 60 cases.  Now, in one of

20   your emails to Mr. MacMull, you suggested that you had a

21   repository of cases.

22         MR. FELDMAN:  Correct.

23         THE COURT:  And is that repository from which you drew

24   when you were thinking about how to prepare the memorandum in

25   this case or something else?

P8MRFLYc

|  |  |
|---|---|
| 1 | MR. FELDMAN:  So there's two different repositories. |
| 2 | And when I say -- so that repository is not the same repository |
| 3 | that I used for the initial part of the case. |
| 4 | THE COURT:  But you said that you did. |
| 5 | MR. FELDMAN:  There's two different.  I have two |
| 6 | different -- when I said "repository," I meant I had a folder |
| 7 | of cases that were downloaded or collected that were based on |
| 8 | the -- all the cases that were cited in the premotion briefing. |
| 9 | So that means every single -- |
| 10 | THE COURT:  Is it your view, sir, that there were 60 |
| 11 | cases cited in the premotion submissions? |
| 12 | MR. FELDMAN:  No.  I'm saying I don't remember how |
| 13 | many there were.  I couldn't say one way or another.  There |
| 14 | were many cases that were cited.  I was actually going through |
| 15 | both the cases that were cited by plaintiff's counsel in their |
| 16 | letters as well as the cases cited by other counsel for |
| 17 | defendants as well as the unique areas of case law that I felt |
| 18 | were important to distinguish.  For example, the case that I |
| 19 | cited involved -- I don't remember it offhand but the NFL case |
| 20 | that I cited involving -- I believe the word was controlled |
| 21 | carnage, which involved an arbitration agreement where your |
| 22 | Honor ruled upon.  So, for example, that was a case that I had |
| 23 | in my corpus, but that was not a case that was cited by |
| 24 | opposing counsel or by cocounsel or by anybody else for that |
| 25 | matter. |

P8MRFLYc

1          THE COURT:  OK.  Go ahead.

2          MR. FELDMAN:  So in terms of the corpus of cases, so

3     the way I do my analysis is that I gather all the cases that

4     were cited prior in the cases so I know where all the parties

5     are in terms of their positioning.  And then what I do is I do

6     a critical analysis of those cases following the line history.

7     So, for example, just to use as an example, when an argument is

8     being made about trademark infringement concerning warranty,

9     OK.  I'm just using this as an example because I did not get

10    into that, but I think it's important to make the point.

11         So one of the things that I looked at was what the

12    standard of party expectation was for warranty.  So, for

13    example, I followed all the case law going back to 1930 where

14    some of this was developed in terms of the expectations of

15    consumers when they are purchasing a warranty.  Because in

16    those line of cases, at that time, prior to the age of the

17    internet and prior to, it's cheaper to buy a new one than it is

18    to fix, you know, that was the -- that was where the case law

19    really came from.  So I focused, for example, on a lot of those

20    cases that were foundational to the way the court today views

21    consumer-related concerns in the law.

22         THE COURT:  And what legal research databases are you

23    using to do this?  For example, do you have the books at home

24    and you are going through those or are there computer-aided

25    legal research databases you are using or something else?

P8MRFLYc

1          MR. FELDMAN:  So there's a few different levels.  So

2     at the time when I first started this case, I had something

3     called Casetext.

4          THE COURT:  Yes.

5          MR. FELDMAN:  Now Casetext was purchased by Thomson

6     Reuters, OK.  Originally Casetext had access to the largest

7     non -- basically the largest available data set.  I believe ——

8     and, again, I can't verify now because it's too late —— they

9     had access also to Westlaw private citators, which is the one

10    thing that I needed, especially with regard to federal practice

11    and being able to cite to cases outside of the tristate area,

12    because, again, case law, especially when it comes to

13    arbitration arguments and especially when it comes to cases

14    with arbitration with technology companies --

15         THE COURT:  Please slow down, sir.  Thank you.

16         MR. FELDMAN:  Sure.  Cases involving both technology

17    and non-technology cases involving non-Second Circuit case law

18    because oftentimes the decisions that relate to interpreting

19    arbitration agreements, interpreting warranty, interpreting the

20    expectations of online commerce since the dot-com boom has

21    become the territory of the Ninth Circuit.

22         So to the extent that -- if you would like to look for

23    cases in the second department, there are cases, but many are

24    unpublished.  And when it comes to threshold cases such as

25    preliminary orders on motions to dismiss or preliminary orders

P8MRFLYc

1    on -- those are often not reported.  And, again, I don't know

2    who makes the decision when to report them, but if you want to

3    get those cases, you can either go to PACER and download them

4    yourself; you can go to something called the free -- I forget

5    the term.  You can also go to something called the Free Law

6    Project, FLP, and they've been sued by Westlaw, I believe.  And

7    what they did is they have a project called Recap where if

8    somebody downloads a PACER case, a PACER decision, they can

9    share it with others so that others have access to it without

10   having to pay the PACER fee.

11           THE COURT:  OK.  Sir, as I understand it, Casetext was

12   purchased by Thomson Reuters in August of 2023.

13           MR. FELDMAN:  Correct.

14           THE COURT:  And this case was filed in December 2024.

15           MR. FELDMAN:  That's correct.

16           THE COURT:  So one of the things you said to

17   Mr. MacMull, for example, is that some of these citations were

18   originally gathered during my initial research in

19   December 2024, when I had broader access to legal databases,

20   including Casetext with CoCounsel.

21           MR. FELDMAN:  Right.

22           THE COURT:  However, when did your access to Casetext

23   expire?

24           MR. FELDMAN:  At the end of 2023 --

25           THE COURT:  Yes.

P8MRFLYc

1          MR. FELDMAN:  -- there was -- so I actually had

2    correspondence with Casetext to discuss with them.  I actually

3    spoke with the CEO of the company at the time to talk to him

4    about some of the issues that I had with the -- with Casetext

5    as product, and I also used to -- when I was in law school, I

6    worked -- I was trained to work for Westlaw in their student,

7    you know, research unit.  I never ended up doing it, but at the

8    time, I learned about how Westlaw does a lot of their --

9          THE COURT:  Sir, you are not answering my question.

10          MR. FELDMAN:  I'll get to that.

11          THE COURT:  No.  I want you to actually answer my

12    question.  I don't want the scenic route, sir.

13          So when did you stop using Casetext?

14          MR. FELDMAN:  So Casetext then called me after

15    whenever it happened in 2023.  I don't know the date.

16          THE COURT:  August of 2023.

17          MR. FELDMAN:  When it was announced.  Casetext, at

18    that point in time, went into a sort of, you have a choice.

19    You could continue using us and then it would be done, or you

20    can jump on board with Westlaw and pay a cut rate for access to

21    Casetext and CoCounsel, which was their -- which was one of

22    their tools that they had which involved, you know, cite

23    checking, but it used an AI format which now belongs to

24    Westlaw.

25          That -- so I jumped onto the Westlaw bandwagon but

P8MRFLYc

1    under the Casetext framework, which meant that when I logged

2    in, I had a Westlaw login for Thomson Reuters but extremely

3    limited access.  I had access to Casetext but also extremely

4    limited access, because when Casetext was transferring over to

5    Westlaw, whatever they did messed things up.

6           So in addition -- yes.  So in that period of time,

7    between the time that I stopped paying for Westlaw, I had

8    access to Westlaw in a limited fashion.  I had access to

9    Casetext in a limited fashion because the two were not

10   completely merged.

11          THE COURT:  For how long did that persist?

12          MR. FELDMAN:  Until around December of 2024.  And then

13   I assume in January things were over, but at that point in

14   time, I told them I'm no longer going to subscribe to Westlaw

15   because essentially I felt that it was a bait and switch.

16          THE COURT:  All right.  And so by December of 2024,

17   you no longer had access --

18          MR. FELDMAN:  At the end of December 2024.  By

19   January, essentially I had no longer had access or limited

20   access.  I did have some access because I would check it to

21   say, hey, did you fix your problems with the transition from

22   Casetext to Thomson, but there was no way I could use it in an

23   effective manner.  In fact, I told them I wanted to cancel my

24   thing.  They then had correspondence with me.  Again, I don't

25   remember the exact timeline, but I had correspondence with

P8MRFLYc

1    various customer satisfaction associates, and I had multiple

2    emails with them saying, hey, you guys, the services don't work

3    as intended.  The warranty -- the intended purpose of purchase

4    was not good, and to this day, I still have a dispute with

5    Westlaw.

6              THE COURT:  All right.  Fine.  But the complaint in

7    this case was filed on December 11 of 2024.  When was it served

8    on your client and when you were retained?

9              MR. FELDMAN:  I was retained on December 11 -- I

10   believe December 11 or December 10, my client received a cease

11   and desist order.  I was retained to respond to the cease and

12   desist order.  I sent a response to the cease and desist order

13   on December 11 -- on December 12, I think.  I don't remember

14   exactly the date.

15             When I was doing that cease and desist order prep, I

16   did most of the research involving what I used to prepare my

17   response.  Part of that research involved in -- part of that

18   research involved some of the underlying things in this case.

19             THE COURT:  One moment, sir.  You say most of the

20   research did you to prepare a response.  What do you mean by

21   that?  Do you mean the answer or do you mean your affirmative

22   motion to dismiss?

23             MR. FELDMAN:  No, my response to the cease and desist

24   letter.

25             THE COURT:  I see.  Thank you.

P8MRFLYc

| | |
|---|---|
| 1 | MR. FELDMAN:  The cease and desist letter contained |
| 2 | various accusations which are somewhat in the complaint.  I was |
| 3 | not aware that the date after the cease and desist order was |
| 4 | dated a lawsuit had been filed, but at that time I wasn't |
| 5 | aware. |
| 6 | THE COURT:  All right.  So I see that there appears to |
| 7 | have been a waiver sent on or about December 17. |
| 8 | MR. FELDMAN:  Correct.  I mean, I can't say correct, |
| 9 | but I can -- |
| 10 | THE COURT:  OK.  I have on the docket on January 15, a |
| 11 | waiver of service returned, executed as to Affable Avenue.  The |
| 12 | waiver was sent December 17, 2024, so I see that. |
| 13 | Now, I don't think we have a conference until February |
| 14 | or March.  There's an amended complaint in April of 2025.  The |
| 15 | initial pretrial conference was held on April 11 of 2025.  So |
| 16 | by then, sir, you no longer had access to CoCounsel or Casetext |
| 17 | or Westlaw for that matter. |
| 18 | MR. FELDMAN:  That is correct. |
| 19 | THE COURT:  You had some materials that you had |
| 20 | gathered in connection with the response to the cease and |
| 21 | desist order.  Of course, that was based on whatever the |
| 22 | arguments were with the cease and desist order, which may or |
| 23 | may not have made their way into subsequent iterations of the |
| 24 | complaint. |
| 25 | When you spoke about the repository of cases that |

P8MRFLYc

1    you've compiled, was that in connection with your response to

2    the cease and desist order or is this repository to which you

3    refer something else?

4            MR. FELDMAN:  The repository, again, I think -- you

5    are using the term repository.

6            THE COURT:  Sir, I'm repeating your term.

7            MR. FELDMAN:  Right.  The term that I used in my email

8    with cocounsel, right?

9            THE COURT:  Yes.

10           MR. FELDMAN:  So when I was referring to that, I would

11   have to see the actual context.  If you could read the context

12   back to me.

13           THE COURT:  I did, sir.  Thank you.

14           MR. FELDMAN:  I don't have that in front of me right

15   now.

16           THE COURT:  It's an exhibit in this case, sir, but go

17   ahead.

18           MR. FELDMAN:  Right.  So it is on the record.

19   However, I'm right now speaking under oath, and I --

20           THE COURT:  Yes, about a document that you wrote, an

21   email you wrote.  What is the repository?

22           MR. FELDMAN:  I don't recall what it says.  I can't

23   say for sure.  So I know that you used the term repository --

24           THE COURT:  Ms. Noriega, can I ask you, please, to

25   show Mr. Feldman the bottom paragraph of this page?  I'm asking

P8MRFLYc

 1    him what he means by the term repository.  This is the term

 2    that he used.

 3            MR. MacMULL:  Could you tell us the page you are

 4    looking at?

 5            MR. FELDMAN:  Well, it's not paginated the same way.

 6            So, Mr. MacMull, thank you for your message

 7    regarding --

 8            THE COURT:  Don't read it into the record, sir.

 9            MR. FELDMAN:  So I wrote:  Many of the citations were

10    drawn from a repository of many cases I compiled in connection

11    with Amazon cases.  Right?

12            THE COURT:  Yes.

13            MR. FELDMAN:  Since I was first retained in this and

14    similar matters.

15            THE COURT:  OK.  So what is the repository?

16            MR. FELDMAN:  Including older decisions that have

17    shaped the legal framework relevant to the claims at issue.

18    Some of those --

19            THE COURT:  Sir, I specifically told you not to read

20    this into the record.  I'm asking you a very simple question.

21    What is the repository to which you refer?

22            MR. FELDMAN:  It's a repository of, I would say,

23    numerous cases that I have collected over the last few years

24    involving cases where I was involved with Amazon-related

25    disputes, Amazon-related issues.

P8MRFLYc

1          THE COURT:  How is it collected, sir?  Is it a folder?

2     Is it an electronic document?  How does this repository exist?

3          MR. FELDMAN:  I have electronic -- I have folders.  I

4     have folders where I have actual like copies of cases or I have

5     snippets of cases that I copied from in my -- you know, that

6     I've copied from in order to develop the line of reasoning that

7     I use when I'm making arguments.

8          THE COURT:  And so by the time you were preparing your

9     brief in support of your motion to dismiss, we had had the

10    premotion conference.  There was an exchange of letters in that

11    regard.  There was also a letter in or about May from

12    plaintiff's counsel that is referring to certain things.  I see

13    your response is May 16.

14         I suppose I should go back one step.  At the time you

15    were preparing the response to the premotion letter --

16         MR. FELDMAN:  Yes.

17         THE COURT:  -- you were using this repository, or

18    where were you getting your cases and your arguments?

19         MR. FELDMAN:  So, for example, the case that I found

20    about your Honor's decision regarding controlled -- I think the

21    word was controlled carnage.  I don't remember because I was

22    looking specifically for your Honor's arbitration decisions.

23         THE COURT:  If it's the NFL case, I had one NFL case

24    involving Ezekiel Elliott.

25         MR. FELDMAN:  That was, yes.

P8MRFLYc

1          THE COURT:  That may be it, although I would not think

2     that that was necessarily relevant to what was going on here

3     but OK.  Where did you find it?

4          MR. FELDMAN:  I actually researched -- I don't

5     remember exactly how I researched, but I researched for your

6     Honor's name as well as decisions regarding arbitration.

7          THE COURT:  I'm just going to note something that may

8     have relevance later on.  Your letter to me of May 16 cites the

9     Himmelstein decision that causes us so much consternation later

10    on.  There you got it right.  You got the case name right.  You

11    got the court right.  You got the citation right.  I will never

12    understand ── but you will eventually tell me ── how it is it

13    came to be so wrong later on.

14         So you prepared your premotion letter.  I scheduled

15    briefing on the motion to dismiss.  Go ahead.

16         MR. FELDMAN:  Because you are making a point which is

17    a valid point.  There was a disconnect between the line of

18    reasoning that I used in my drafted letter that I wrote at that

19    time, which was based on my own research and my own collection

20    of documents and snippets of cases that I refer to in the past,

21    whether those were -- and, again, those were from, sometimes,

22    Goggle Scholar.

23         Google Scholar has a -- their citations are not full

24    citations in the sense that you would only have, for example,

25    the name of the case and --

P8MRFLYc

1          THE COURT:  What is the name, Legal Scholar?

2          MR. FELDMAN:  Google Scholar at Google.com, which is a

3    free database which used to be quite robust, which involved the

4    ability, for example, to check case cites, so you can see where

5    the case is cited in other cases.  However, they will not use

6    Westlaw reporters.  And so, for example, in New York cases,

7    they'll only use, for example, slip opinion numbers.

8          THE COURT:  We are getting ahead of ourselves.  I'll

9    simply note that Google Scholar does not help you here because,

10   of course, the Himmelstein decision is a reported decision.

11         MR. FELDMAN:  It's a reported decision, and that's the

12   way I reported it.

13         THE COURT:  Yes, except when you didn't.

14         MR. FELDMAN:  And when I didn't, which I addressed in

15   my letter, and that does not -- again, I wasn't citing it for

16   my purposes.  I was quoting -- it was not -- it was not --

17         THE COURT:  Sir, we will get into that at some later

18   point.

19         MR. FELDMAN:  Sure.

20         THE COURT:  You're suggesting to me that for this

21   May 16 premotion submission, you're using your existing legal

22   research and Google Scholar?

23         MR. FELDMAN:  Google Scholar.

24         THE COURT:  And what else?

25         MR. FELDMAN:  At that time, I believe I was starting

P8MRFLYc

 1   using vLex.

 2          THE COURT:  Yes.  VLex has AI components to it, but

 3   let me understand how you are using it.

 4          MR. FELDMAN:  So in terms of the AI components, there

 5   are -- it has multiple -- I just need a drink.

 6          THE COURT:  We can take a break.  We don't have water.

 7          MR. FELDMAN:  I have a drink.  May I?

 8          THE COURT:  All right.

 9          MR. FELDMAN:  Thank you.  Can you repeat?

10          THE COURT:  Yes.  I'm trying to understand, please,

11   how you are incorporating vLex into the preparation of the

12   premotion letters.  But please make sure your throat is clear.

13   I don't want you to have any problems.

14          MR. FELDMAN:  It's not.

15          THE COURT:  Take a moment, sir.

16          Off the record, please.

17          (Off-the-record discussion occurred)

18          THE COURT:  The question, as I recall, sir, is I

19   wanted to understand how you were using vLex in the preparation

20   of your premotion submissions.

21          MR. FELDMAN:  So I don't recall exactly how I used it,

22   but I can tell you how I generally approach vLex.  So vLex is

23   a -- is an old product, which went under -- I forgot the name

24   of the term of what it used to use.  Maybe Veritas or some

25   other term.  I used to use it in the past.  Oh, it was called

P8MRFLYc

1    Fastcase, F-a-s-t-c-a-s-e.

2            It was offered with, I believe, Loislaw, one of the

3    older citation databases.  They were -- I believe in my view,

4    they were substandard in terms of their ability to do anything.

5    However, once I could no longer use CoCounsel and Casetext and

6    Thomson Reuters, which originally -- which was part of the

7    initial subscription that I had, I had to stop using that, and

8    I had to use other sources.  So I experimented with several

9    different options.  The one option that was available that was

10   affordable was vLex.  VLex was offered through the New York

11   State Bar Association.

12           So I used -- I got onto vLex, and for the most part,

13   it has some limited research capabilities.  Unfortunately, it

14   does not have good citation capabilities, or at least then at

15   that point it did not have.  One of the issues with citation at

16   that point in time was that when you reported a case, they only

17   provided you with a certain part of the actual citation, not

18   the full citation.  So, for example, they wouldn't provide you

19   with -- I think they didn't provide you with the full name and

20   string.  They only provide you with the reported citation or

21   not unreported citation format, but it wasn't in legal form or

22   it wasn't in the proper form.

23           Whenever I would do a vLex search, where I am

24   reporting a case from vLex, I would then have to go to another

25   step, which is check citation or cite check.  If it was a

P8MRFLYc

1    larger case where I had more time or I had whatever, I would go

2    to the law library, and I would do -- I would spend a few hours

3    on Westlaw or Lexis researching those issues.  I don't remember

4    if these cases specifically I did research in -- using the

5    court's available free research through Westlaw at the library.

6           THE COURT:  You would go to a law library and use

7    Westlaw and Lexis for free using whose password?

8           MR. FELDMAN:  Using the public -- the available public

9    resources that they have over there.

10          THE COURT:  I see.

11          MR. FELDMAN:  Under the New York State reporting

12   system library resources.

13          THE COURT:  All right.  But you're saying that as you

14   were using vLex, you knew that there were problems with

15   citations.

16          MR. FELDMAN:  Absolutely.

17          THE COURT:  You knew that because you never got a full

18   citation.

19          MR. FELDMAN:  It wasn't -- no.  The citations were

20   sometimes full because.  They sometimes were embedded in cases.

21          THE COURT:  Yes.

22          MR. FELDMAN:  So I trusted the cases that they cited

23   in full were correct.  But in terms of doing full citations in

24   an actual brief, I had to do my own second check, which the way

25   I do that often is I would take the citations that are in the

P8MRFLYc

 1  case or that I'm citing, and then if I'm going to use them, I

 2  would then go to what is called Google Scholar as a cite

 3  button, which is what I included in my thing.  And I would

 4  enter the -- either the case name.  Sometimes the case names

 5  would not be the same because not all reporters report cases

 6  the same way.

 7          Also, if you don't have an official reporter, you have

 8  to decide how to name a case with multiple parties.  Like, for

 9  example in this case, the short case is Flycatcher vs. Affable,

10  right, but if you wanted to do -- I don't know how Westlaw

11  would cite it, but Westlaw would cite it potentially

12  differently than the way I would cite it.

13          THE COURT:  OK.

14          MR. FELDMAN:  So I have to make a judgment call

15  sometimes with how to cite cases that are not reported or cite

16  cases that are reported in vLex or in other cases.

17          THE COURT:  But that would seem to extend only to how

18  you would name the case, not how you would cite it.  For

19  example, you might have a Westlaw site or Lexis cite or a

20  miscellaneous cite, but I'm not sure -- my real concern, as

21  we'll get to, is that there are just cases in your brief for

22  which those cites don't exist, that case name doesn't exist, or

23  that case name has a different cite.  Again, we'll get to that.

24          You went to the library only to cite check and not to

25  do research?

P8MRFLYc

1          MR. FELDMAN:  No.  I went to do research as well.

2          THE COURT:  On Westlaw?

3          MR. FELDMAN:  On Westlaw and Lexis.

4          THE COURT:  OK.  And you said a few moments ago that

5    sometimes when you had a larger submission, that might

6    determine whether you went to the library.  I want to make sure

7    I understand that correctly.

8          MR. FELDMAN:  Correct.

9          THE COURT:  So perhaps if you had a one-paragraph

10   letter you were writing to the Court, you might not make your

11   way to the law library.  But for an actual brief, you would go

12   to the library and do a brief search and cite checking at the

13   library?

14         MR. FELDMAN:  Correct.

15         THE COURT:  All right.

16         MR. FELDMAN:  I mean, if I felt that it was necessary

17   to do a cite check.

18         THE COURT:  All right.

19         MR. FELDMAN:  Now when I do -- again, to the extent

20   possible, I try -- I will -- I check every single one, double

21   check every one, because I want to make sure that they are

22   correct.  But at the time if I felt that the citation was

23   sufficiently correct based on the way that it was cited in

24   other cases that I found that were similar, I would use them.

25   However, I also found out subsequently that oftentimes cases

P8MRFLYc

1    are cited, for example, Westlaw cases are cited in reporters

2    that are not reported.  And sometimes I will find them and I

3    would say, OK, I would rather not use the Westlaw reported

4    citation or the non-official citation that Google uses, and

5    I'll try to find another case that will cite to that case in --

6    that will cite to that case.

7            THE COURT:  I don't understand why you would do that.

8    What you're saying is if there is a decision that exists, it's

9    an unreported decision.  It exists only with a Lexis cite or

10   Westlaw cite because there's no reporter that cites it.  Are

11   you suggesting that what you wanted to do is find some other

12   case citing that case?

13           MR. FELDMAN:  Which I would do.

14           THE COURT:  Why would you do that?  It doesn't tell

15   you what the case says.  That tells you what some other court

16   thought the case said, but that's not a legitimate way of cite

17   checking or doing research.

18           MR. FELDMAN:  Absolutely.  It's definitely not.  I

19   would parse that out.

20           THE COURT:  You keep saying "parse that out."  I find

21   that interesting, sir.  Go ahead and parse that, but then you

22   are going to explain to me how you put together the actual

23   brief in support of your motion to dismiss in this case.

24           MR. FELDMAN:  OK so -- OK.  Your Honor, I don't

25   remember what I was saying before.  Is it possible to read back

P8MRFLYc

1    the record?

2                THE COURT:  No.  You were parsing something out for

3    me, and what I was suggesting to you was that it was

4    ill-advised for you to cite cases by finding something other

5    case mentioning that case and then seeing the citation

6    contained in it.

7                MR. FELDMAN:  Well, actually -- well, let me clarify

8    that.  What happens is that you have cases that are cited in

9    many decisions.  The same cases cited in decisions, those cases

10   are cited sometimes in subsequent decisions for the actual

11   principal that that case is for.  However, sometimes those

12   citations only refer to a Westlaw citation, or at times,

13   especially if it's a new case, it would show a reporter, F.2d,

14   whatever, and it will have a blank space.

15               THE COURT:  Yes.

16               MR. FELDMAN:  If I'm citing to or referring to the

17   legal argument in that case but I would like to have a full

18   citation, I would try to find another case that cites to that

19   case for that proposition.

20               THE COURT:  Yes.  Although another thing you could do

21   is simply use, at the law library, Westlaw, if it has not yet

22   been assigned an F.4th cite or something like that, you could

23   indicate it hasn't been.  And if it hasn't been, you would see

24   that.

25               MR. FELDMAN:  That's now.

P8MRFLYc

```
 1            THE COURT:  I don't care about now.  Now doesn't help
 2    me.  I need to know what you did here.  I need to understand
 3    because we're doing a postmortem to figure out how one-quarter
 4    of your cases were nonexistent hallucinations.
 5            MR. FELDMAN:  Fourteen out of 60 cited cases.
 6            THE COURT:  Just under one-quarter of the cases.  I
 7    cannot understand how you did that, sir.  Tell me how you did
 8    that, how you put together this brief to be so bad.
 9            MR. FELDMAN:  So after I prepared my -- after I
10    prepared my outline for my brief or essentially most of the
11    arguments that I was doing in my brief which followed my prior
12    research, again, it wasn't complete because at the time I
13    wasn't done yet.  I was going to spend my -- the last week
14    basically finalizing my arguments.  That's when I indicated I
15    received a call from my client advising about what was going on
16    in the -- about what was going on on the Amazon -- in the
17    Amazon side of things with regard to his account, which was
18    involved in this -- which was to some part, not all of it.  But
19    some part of it was involved in this case.
20            And at that point in time, I reached out to counsel
21    that was in communication with Amazon to verify what the status
22    was.  I also went to verify the status of the appeals that were
23    going on in Amazon, which at the time was going nowhere
24    partially because we had this lawsuit and partially because
25    Amazon -- I think as Flycatcher has said, Amazon did not
```

P8MRFLYc

1    respond to their initial complaints to them about theft, and it

2    was only after they complained about it -- so it was reported

3    in the news.  It was only after they complained about it that

4    Amazon did something about it, which included shutting down my

5    client's account.

6         So that changed the case itself because that now meant

7    that my client is being prejudiced by a decision that has now

8    escalated into -- escaladed into Amazon procedures dealing with

9    accounts, which is governed primarily by the BSA, by the Amazon

10   Business services Agreement, which was mentioned in this case.

11        THE COURT:  Yes, and which I said to you was not a

12   very successful or thoughtful way of getting arbitration with

13   respect to Flycatcher.  Sir, once again, I'm really just asking

14   you to answer my questions, and I'm trying to make them as bite

15   size as possible.  I ordered the submission.  There was a third

16   amended complaint.  I don't believe I allowed a fourth amended

17   complaint.  I scheduled the opening briefs to be filed on or

18   before June 20 of 2025.  That is in May.

19        So I want to be sure we're both focusing on the same

20   time period.  The outline of which you speak, the efforts you

21   were going to make in the final week to fill in necessary

22   information, that is in June.  You're saying then that you were

23   derailed because of issues within Amazon?

24        MR. FELDMAN:  Within the Amazon part of it.

25        THE COURT:  You were filing a motion to dismiss, and

P8MRFLYc

1    I'm not sure any of these Amazon issues made its way into the

2    motion to dismiss that you filed with me.  Let us focus on the

3    brief that you filed with me.

4              MR. FELDMAN:  At that time in point, I was trying to

5    get -- I was trying to substantiate the information because --

6    OK.  I think this is an important point, but if your Honor

7    doesn't want me to mention it --

8              THE COURT:  I'll let you make the point, but once

9    again I don't see -- you are asking me to compel arbitration

10   based on terms of service that did not in any way include

11   Flycatcher.  You were trying to bind them to your terms of

12   service with Amazon.  I don't understand how they get bound

13   into it, but I also don't see that any of that discussion is in

14   our opening brief.

15             MR. FELDMAN:  It isn't in my brief.

16             THE COURT:  Right.  So then why do I care about?  I

17   care about what you filed with me.

18             MR. FELDMAN:  Because when I -- because the -- there

19   was a nuanced argument that I was trying to change and make,

20   which I was not ultimately able to make.  However, originally

21   the focus was on -- the focus was, for my arguments, was

22   originally on the standard -- whatever was in the prior

23   submissions because of this change, I felt because of something

24   called, which I believe -- and again, there isn't much case law

25   about it.  But it is the concept of estoppel, and it is used in

P8MRFLYc

1    the context of unions and pension funds where if you are a

2    party to a collective bargaining agreement that has an

3    arbitration clause, or you have a -- or you are a party to or

4    you -- either receive benefits from that agreement, and even if

5    you are not on the agreement, you are really just a me too.

6            THE COURT:  I really appreciate, Mr. Feldman, you

7    trying to teach me the law of --

8            MR. FELDMAN:  I'm just --

9            THE COURT:  No.  But even as you describe it, you are

10   trying to use it offensively against an entity that according

11   to the complaint your client harmed by taking their products.

12   I'm not there, sir.

13           I keep asking you, and I'm not sure why you are

14   refusing to answer me.  I am asking you how you put together

15   the actual memorandum you filed by me, which has none of this

16   discussion of the arbitration issues with Amazon.

17           MR. FELDMAN:  So I redrafted my memo that week.  And I

18   redraft -- I reorganized my entire memo that week.  I then did

19   subsequent research, which focused primarily on case law, which

20   I was not able to find case law in our circuit involving cases

21   on point.  And I didn't have access at that time to Westlaw or

22   Lexis because I didn't have the time to get to it at that time,

23   not because I didn't want to but because I had other things

24   going on.

25           THE COURT:  Sir, that doesn't matter to me at all.

P8MRFLYc

1    Your professional obligation requires you to cite legitimate

2    cases to me.

3              MR. FELDMAN:  Absolutely, your Honor.

4              THE COURT:  Sir, you are not answering my question.

5    I'm not sure how many ways I can ask it.

6              MR. FELDMAN:  So what I did I was -- what I did was go

7    to the active -- Amazon is now based in Washington state.  I

8    looked for cases involving Amazon, cases that interpreted the

9    BSA at that time in active litigation involving Amazon.  At

10   that point in time, I was not using -- there was no -- I did

11   not find any cases on vLex or on -- you know, I was able to get

12   theories of case law, but I was not able to find any -- any

13   reported cases or any cases that involved that.

14             At that point in time, I used both Google Scholar and

15   Google search to search for multiple -- for cases or any cases

16   that involved Amazon and the arbitration submission.

17             THE COURT:  And this is all the week before your

18   arbitration?

19             MR. FELDMAN:  Correct.

20             THE COURT:  I want to make sure I understand this

21   correctly.  You had budgeted your time such that although you

22   had an outline for your submission to me, you were planning on

23   filling in that outline.  You did a lot of work on that outline

24   in the week prior to its submission to the Court.  In that time

25   period, you suddenly pivoted to a different set of arguments

P8MRFLYc

1   regarding arbitration, and you spent that time looking for

2   support for arguments and you found no such support.

3           MR. FELDMAN:  No, it's not that I found no such

4   support.  I had legal theories I was looking for that I

5   found -- that I had seen in other case, and I was looking

6   specifically for Amazon-related cases and primarily in the

7   Ninth Circuit or other circuits where the -- where

8   non-parties -- "non" meaning parties that are not on the same

9   exact agreement but parties that were on separate agreements,

10  meaning similarly signed agreements.  Parties in the same -- in

11  the same -- parties that agreed to the same agreement that were

12  part of the same system, which means that parties at -- for

13  example, in order to get into -- in order to play baseball, all

14  parties, sort of, agreed to the rules that MLB puts forward in

15  terms of how to play.  The National League and American League

16  may have different rules, but ultimately when they play each

17  other, they're each bound to the agreement to play by the rules

18  that are in the marketplace.

19          So in this case, my argument, which was similar to the

20  argument that I had before, but that was not the main thrust of

21  the argument.  But my argument became much more prescient

22  because my client was at the mercy of Amazon at that very

23  moment because Amazon was refusing to release funds from my

24  client's account.  But at that time, that issue became primary.

25  Again, I got a call from my client on Wednesday.  I spoke to my

P8MRFLYc

1    client on Thursday, the Thursday before.  Friday the 20th was

2    the deadline, so the Thursday or Wednesday before, I was

3    informed by my client that -- of this new part of the new thing

4    that was going on.  And instead of it being just a two-line

5    point about being involved in case -- in those cases, I did not

6    have the case law that addressed the specific thing, and I was

7    also on notice because your Honor did not, I believe -- seeing

8    that your Honor did not want to pursue the arbitration angle at

9    that time.

10            THE COURT:  Sir, I didn't, but you did.  My point is

11    you're telling me that you changed gears because of things that

12    were happening at Amazon.

13            MR. FELDMAN:  Correct.

14            THE COURT:  And there is a section at page 12 of your

15    submission.  It's entitled:  All claims are subject to

16    mandatory arbitration.  You are citing *Doctor's Associates* and

17    *Schnabel*, S-c-h-n-a-b-e-l, and my NFL decision.  Those cases

18    are not the ones that were found to be false.  It's all these

19    other cases.

20            So I'm going to ask the question, sir.  At some point,

21    did you use any generative artificial intelligence program or

22    system to assist you with the preparation of this memorandum?

23            MR. FELDMAN:  Yes, your Honor.

24            THE COURT:  Was it vLex or something else?

25            MR. FELDMAN:  It was a combination of --

P8MRFLYc

1          THE COURT:  VLex and what?

2          MR. FELDMAN:  VLex and Paxton AI.

3          THE COURT:  Sorry.  The other one, please?

4          MR. FELDMAN:  Paxton, P-a-x-t-o-n.

5          THE COURT:  And?

6          MR. FELDMAN:  And I also -- I don't remember if there

7    was another one, but I also used Google search, which

8    involves -- this is a Google search itself because I was

9    searching for -- Googling searches to show where the case

10   was -- where Amazon and the BSA, where Amazon and the

11   arbitration agreement, and Amazon -- were to show up.  In those

12   searches, I found several cases in fact.  One of the cases, I

13   think, was Kapes ─── that I cited incorrectly ─── Kapes v.

14   Amazon.

15         THE COURT:  That's K-a-p-e-s.

16         MR. FELDMAN:  Versus Amazon.

17         THE COURT:  Yes.

18         MR. FELDMAN:  Right.  And that was not a non-existent

19   case.

20         THE COURT:  Yes.  So when you clicked on Kapes, what

21   did you see?

22         MR. FELDMAN:  When I saw the search results, which is

23   similar to KWIC, K-W-I-C, which they have their own thing in

24   Lexis, I saw the Kapes case, and I copied and pasted it and

25   said, I'm going to try to use this.  That Kapes case was not an

P8MRFLYc

1    actual case because in the result it was a -- it was actually a

2    case called *CDM v. Amazon.* And the *CDM v. Amazon* case cited

3    *Kapes*, I thought, incorrectly, that the citation was Kapes v.

4    Amazon.

5            THE COURT:  Sir, there are multiple cases in your

6    submission that do not exist.

7            MR. FELDMAN:  So each one of them has a -- I did not

8    address them in my brief, each one, although I would have

9    addressed it if the Court wanted me to, and I put that in my --

10           THE COURT:  You're here now.  I wanted to understand.

11   Are you acknowledging, sir, that you never read any of these

12   cases, that these were embedded cites in other things that you

13   picked up?  Did you ever click on Poly-America ——

14   P-o-l-y-America v. API Industries, Inc., a supposed Eastern

15   District from 2020, did you click on that Westlaw cite, and

16   what did you find?

17           MR. FELDMAN:  So I couldn't access that Westlaw cite.

18           THE COURT:  Then why did you cite it, sir?

19           MR. FELDMAN:  Because there was a similar case that

20   was relevant that I thought was -- when I was looking for the

21   citation, I thought that that was the right case.

22           THE COURT:  So this mystifies me, sir.  You're

23   suggesting that when you couldn't access a case, which, by the

24   way, you could because you could have gone to the law library

25   and used Westlaw to figure out that these cases existed.

P8MRFLYc

1          MR. FELDMAN:  You can only go during the hours that

2     the court is open.

3          THE COURT:  Yes.

4          MR. FELDMAN:  Right.  And at that point in time, I was

5     working on actually getting the facts straight from what was

6     going on at Amazon.  So I couldn't do two things at once.  I

7     could work at my computer, or I could go to the court.  And at

8     that time, I had no more budgeted time because Friday, which

9     was the Friday before, I was not able to find out any more

10    information.  So I was basically left on Sunday, Monday,

11    Tuesday, Wednesday, Thursday, Friday.  That week I had my

12    children's graduations so --

13         THE COURT:  Stop.  Stop.  Do not suggest, sir, that

14    you get to put aside your professional responsibilities to the

15    Court because of your children's graduation.

16         MR. FELDMAN:  Absolutely not.

17         THE COURT:  But you are still not answering my

18    questions, which is getting to the point of being frustrating.

19    Look, if you don't want to be straight with me, if you don't

20    want to answer questions with candor, that's fine.  I'll just

21    make my own decisions about what I think you did in this case.

22    I'm giving you an opportunity to try and explain something that

23    I think cannot be explained.

24         But just looking, for example, at page 3 of your

25    brief, you say as follows:  The Second Circuit has made that

P8MRFLYc

reselling of genuine goods, even without authorization, does
not violate the Lanham Act unless the goods are materially
different or consumers are misled about the product's source.
You cite two cases, neither of which exists.

MR. FELDMAN:  If your Honor can tell me which cases
were the ones I cited?

THE COURT:  Poly-America LP v. API Industries and
Storm Manufacturing Group, Inc. v. Weather Tec Corp.

MR. FELDMAN:  So those two cases, Storm Manufacturing
and Poly-America, there are multiple cases that -- when I
searched on the case law that have similar issues.  In fact,
many of those cases were -- Storm has 25, 30 cases and so does
Poly-America have multiple cases.  I believe plaintiff's
counsel was on one of them, if I'm not mistaken.  And those
cases are -- they are spelled -- some of them are spelled API,
some of them are Poly-America.  Many of them are different.  I
was using initially when I was researching -- when I was
researching these cases, I was using the -- I was using the
combination of Google and -- and I already -- and I have cited
the -- I have cited -- not cited but I have the Poly-America
case that I intended to cite, and I think I submitted --

THE COURT:  Sir, you cited two cases that didn't
exist, and the fact that there may be many cases that do exist
doesn't absolve you of citing cases that don't exist.

The second thing, to tell me that there was a

P8MRFLYc

1    litigation captioned Storm Manufacturing Group v. Weather Tec

2    but this just wasn't part of it, once again, does not make me

3    feel any better.  I want to understand how you felt compelled

4    to cite cases that did not exist.  You clearly didn't read the

5    cases.  You didn't read either of those cases, correct?

6             MR. FELDMAN:  I don't -- no.  I --

7             THE COURT:  You couldn't have.  They don't exist.

8             MR. FELDMAN:  It wasn't the -- the citation that I

9    used, I would not rely on the citations when I was first

10   searching the cases.  So if I cited to a case that cited to

11   another case, I may have cited to a case that was not -- I may

12   have referred to, not cited, but I referred to that case.  When

13   I went to check to see the case and find the case, I mistakenly

14   used the citation that did -- that, one, the citation did not

15   exist, and two, the citation that I used was not the same

16   citation.

17            Subsequently, and this is where I --

18            THE COURT:  You're suggesting to me that somewhere in

19   the docket of Poly-America LP v. API Industries is a decision

20   that supports your point, but you simply cited to the wrong

21   case in the docket?

22            MR. FELDMAN:  No.  It was a different case with a very

23   similar name.

24            THE COURT:  But that's not the same case.  The actual

25   cite, sir, that you have here is to a case called McCoy v.

P8MRFLYc

1    Burress.  It is from the District of Kansas, and it talks about

2    the timeliness of motions and relation back, which has nothing

3    to do with any of the issues in that case.

4         MR. FELDMAN:  The reporter that I cited to was

5    incorrect.

6         THE COURT:  Sir, it's not a reporter.  It's an

7    unreported decision on Westlaw.

8         MR. FELDMAN:  Westlaw is a reporter, if I'm not

9    mistaken.

10        THE COURT:  Well, OK, but --

11        MR. FELDMAN:  So I could not check.  So I saw -- I got

12   the case that had only a -- that had an unofficial citation,

13   whether it was a citation to the civil case docket, which I

14   prefer not to use.  I use the --

15        THE COURT:  But that might have been accurate, which

16   this was not.

17        MR. FELDMAN:  Correct, and that's -- and I, in favor

18   of using the official citation if one was available and Westlaw

19   in this district, which is preferred, I continued looking if

20   there was a Westlaw case, and I found, in searching, a case

21   that cited the Westlaw case.  I thought it was the same case.

22        THE COURT:  If I did a search of the entire Westlaw

23   database and put in the Poly-America name and this 2020 Westlaw

24   cite, I'm not going to find another court in the land who

25   actually cited this case because it doesn't exist, right?

P8MRFLYc

1          MR. FELDMAN:  Correct, your Honor.

2          THE COURT:  So what possessed you to think that you

3   could?

4          MR. FELDMAN:  Again, what I've done in the past is I

5   would search for the same case name, OK, but again doesn't have

6   the citation, and I would try to find where that case was cited

7   in other cases for the same proposition.  Now, when I found --

8   in this particular situation, I found a case that had -- that

9   is Poly-America that is not in this district.  But when I tried

10  to cite to that case, at some point, again, I did not realize

11  that it was not the same case.  The name was different, but

12  there is a cite called Poly-America in this district.

13         I don't remember the API Industries or Poly-America,

14  but one of them was correct.  At that time, I thought it was

15  correct.  At that time, I was already -- I was drafting the --

16  I was, at that point, I was -- I had a bunch of cases that I

17  thought were correct and that I thought represented the

18  position that I was saying now.  Some of them, the names were

19  correct, and some of them the citations were not correct but

20  the names were correct.  For example, I think there was a case

21  called S'well, where I was trying to find that case, but in the

22  case, it was not referred to as S'well.  It was actually

23  referred to as --

24         THE COURT:  The S'well is S-'-w-e-l-l.

25         MR. FELDMAN:  Correct.

P8MRFLYc

1          THE COURT:  Sir, I don't know how many times I can ask

2     you this.

3          MR. FELDMAN:  Yes.

4          THE COURT:  What you're suggesting to me is that you

5     found cases that maybe supported your position, but then

6     somehow you managed to either miscite the case or miscite the

7     case and provide a citation to a case that does not exist.  I

8     will never understand why you are doing that.  But I do think

9     that also runs headlong into another argument you were making

10    because you were saying to me, or you were saying to

11    Mr. MacMull, that some of these cases are the product of

12    hallucinations.  Did you not say that?

13         MR. FELDMAN:  I don't remember if I said that.  But I

14    may have said they were likely to be or may have been the

15    product of hallucinations.  At that point, I was not sure

16    because I didn't investigate to see where any of them were.

17         THE COURT:  If what you are saying is true, which is

18    that your problem, your mistake, is that you're finding case

19    citations that prove your point, but you are having difficulty

20    translating the cites as you find them into a cite that you can

21    use in your decision.

22         By the way, to be clear, I don't actually believe

23    that, but go ahead, go with that as your argument, and that's

24    the problem.  Then I don't understand how these are so wrong.

25         MR. FELDMAN:  So I ran -- so then I subsequently, when

P8MRFLYc

1   I put them together in terms of my final brief, I think, on

2   Friday at some point in time, I ran those -- I ran some of the

3   arguments through vLex.  The ones that were Westlaw citations

4   were not picked up because they do not check any Westlaw

5   citations.

6          THE COURT:  Correct.

7          MR. FELDMAN:  And then subsequently, I went through a

8   cite checker either -- it may have been Paxton AI first, and

9   again, did not pick up on any of the citations as being wrong.

10  And then subsequently, I ran it through AI to check again, and

11  they either -- either the AI corrected it, meaning, came back

12  with a different citation that was the proper citation or came

13  back with a citation that was not the proper citation, but at

14  that point in time, I did not know that those citations that

15  were final, which were the ones that I was supposed to check

16  and make sure that they were correct, those were the ones that

17  ultimately ended up in the brief.

18         THE COURT:  You didn't cite check the brief before you

19  submitted it to me.

20         MR. FELDMAN:  Sorry.

21         THE COURT:  You didn't fully cite check the brief,

22  before you submitted it to me.

23         MR. FELDMAN:  Correct, I did not.

24         THE COURT:  You cited cases that, again, do not exist.

25         I want to understand the use of AI in the drafting of

P8MRFLYc

1  the brief.  Are you telling me now that your use of AI was

2  limited to checking citations of cases?  Give me all of the

3  ways in which you used AI in the preparation of this brief.

4         MR. FELDMAN:  I would -- I put together multiple

5  arguments, and I drafted and redrafted parts of the -- parts of

6  the arguments that I made.

7         THE COURT:  You used AI to assist you in drafting the

8  brief?

9         MR. FELDMAN:  I used AI to assist in organizing my

10  arguments in the brief, yes.

11         THE COURT:  That was unwise.

12         You also used AI for research?

13         MR. FELDMAN:  To search for where it -- to search

14  those cases -- to search that those cases were, in fact, there

15  or that there were other cases that were reported.

16         THE COURT:  I want to make sure I understand that.

17  You used AI.  How did you use AI to research the issues that

18  were discussed in your brief?

19         MR. FELDMAN:  If there was an issue that was framed

20  as -- if there was an issue framed as -- I don't recall, but if

21  there was an issue framed as -- I don't recall, but whatever

22  the issue is, I would draft whatever I would draft and then I

23  would check it and say, is this a good restatement; is it

24  proper -- is the citation proper, or something like that.

25         THE COURT:  When you did legal research in the first

P8MRFLYc

1    instance, were you doing the research all by yourself or were

2    you using AI?  Were you asking either vLex or Paxton AI to find

3    for you cases for a particular proposition?

4         MR. FELDMAN:  I used Paxton AI.  No, I used Vincent --

5    vLex to find the general areas of case law.  What is the case

6    law when it comes to, for example, cases in which parties to

7    the same contract are also bound -- parties to a similar

8    agreement -- to the same agreement but not on the same page of

9    the agreement, are there cases that address that issue?

10        And that's -- and that came back with multiple

11   secondary sources and other sources that refer to courts

12   viewing Amazon as what is called a gate keeper or a platform

13   manager, which is a concept that is not frequently found in

14   cases.

15        THE COURT:  Yes, but sir, the portion of your brief

16   that actually addresses Amazon and the arbitration agreement is

17   quite small.  A lot of your brief speaks about the trademark

18   infringement and GBL Section 349 claims.  So I would think that

19   the Amazon cases to which you refer actually have not nothing

20   to do with the arguments in your brief.

21        MR. FELDMAN:  The GBL 349 cases, I was focused not on

22   the number 349 but on the concept of consumer protection.

23   Because 349, the statute, 349 is a consumer protection statute.

24        THE COURT:  Thank you for telling me.  I did know

25   that.  Thank you.

P8MRFLYc

1          MR. FELDMAN:  No, no.  I was looking to see broadly in

2     other jurisdictions to see how the courts interpret consumer

3     protection statutes in general in connection with the way that

4     consumers would be confused potentially in a trademark case.

5     So I wanted to see if there was cases that had similar a line

6     of argument, which wouldn't necessarily imply 349, but they

7     would imply other -- they would apply the same kind of public

8     policy reasoning that exists in Section 349.

9          THE COURT:  Sir, we're going to take a break in a few

10    minutes because I've been tormenting our court reporter, and I

11    don't want to unnecessarily.  I want to understand this before

12    we break.  We keep talking about this list of cases that you

13    acknowledge do not exist, and there are also cases that do

14    exist but do not contain the quotes that you ascribe to them.

15         I want to understand whether your position today is

16    that each and every one of these errors was the product of you

17    finding a case that you then were unable to translate from the

18    mode in which you found it to a Westlaw cite or were the

19    product of hallucinations or both.

20         MR. FELDMAN:  I would say both because it would be the

21    product of -- it would be the product of finding a case --

22         THE COURT:  Let me be more pointed about it.  You are

23    telling me that some of these things, I should just squarely

24    place the blame on you as a researcher and as a drafter,

25    because what you did is you found a case, but in your efforts

P8MRFLYc

1    to translate night a citation form that I might recognize, you

2    attributed to it the wrong citation.

3          You are saying this case really does exist, Failla, if

4    you look for it.  It's just got the wrong cite.  But you are

5    also telling me that there are some things that are not really

6    your fault as much as they are AI hallucinations.

7          MR. FELDMAN:  No, I'm saying they are my fault

8    regardless.

9          THE COURT:  Good.  I appreciate that.  But are they

10   the product of those two things?

11         MR. FELDMAN:  Yes.

12         THE COURT:  So things came together, and you did not

13   bother to check them.  They are hallucinations from AI, and you

14   did not check them.

15   A.  When I went back to check them -- I didn't know that they

16   would be hallucinations because they did not appear --

17   especially when I saw the full -- when I did my searches and I

18   didn't see any -- I didn't see any regular flags or anything --

19   red flags or anything that would indicate that it wasn't

20   correct, then I still went and ran it through -- I ran all of

21   it through AI to make sure that there was no -- that there was

22   no incorrect citations.  And then I ran it through -- I believe

23   I ran it through Vincent AI and other things, and, again, they

24   did not come up as either these are wrong or they didn't exist.

25         THE COURT:  But, sir, you couldn't run them through

P8MRFLYc

1    Vincent AI because Vincent AI, it wouldn't recognize Westlaw

2    citations.

3             MR. FELDMAN:  I didn't know that.  I didn't --

4             THE COURT:  That is no -- OK.  Go ahead.

5             MR. FELDMAN:  No, no.  I didn't realize that it would

6    not recognize the Westlaw citations.  I thought it would

7    provide me an alternative citation that would be correct, not

8    that it would be only a Westlaw citation.  I thought it would

9    provide me, for example, with a non-reported version of the --

10   now, in looking in hindsight, I know that they don't, but at

11   the time I did not know that it would not provide me with an

12   alternative citation or if it has in its database knowledge

13   of -- it has a vector that would make sure that any Westlaw

14   citation, especially if it's been reported in other cases that

15   are reported, that those Westlaw citations are correct, not

16   that it had access to -- that it would provide you with a

17   Westlaw citation.

18            THE COURT:  All right.  Let's take a break here.  I'll

19   see you all in ten minutes.  Thank you very much.

20            (Recess)

21            THE COURT:  Thank you, everyone.  Please be seated.

22   As always, I appreciate your patience.

23            Mr. Feldman, let me please return to the timeline of

24   the submissions in this case.  At the time that you submitted

25   your motion to dismiss, were you aware of the false citations

P8MRFLYc

1    contained in it?

2            MR. FELDMAN:  I was not aware.

3            THE COURT:  In your response to my order to show

4    cause, you say —— and perhaps I should get the exact words ——

5    "A substantially corrected draft prepared within 24 hours."  Is

6    that 24 hours from the day of the filing, sir, or 24 hours from

7    the day you understood that there were false citations in it?

8            MR. FELDMAN:  Twenty-four hours from the time that

9    Mr. MacMull sent me a letter on Sunday.

10           THE COURT:  Right.  OK.  So that's it.  So on Sunday,

11   you receive an email from Mr. MacMull.  Is that the first time,

12   sir, that you're aware that there are citations to cases that

13   do not exist and quotations that do not exist in the cases

14   cited?  Is that the first time you are aware, sir?

15           MR. FELDMAN:  Yes.

16           THE COURT:  Yes.  And so what you're saying is within

17   24 hours of the receipt of that email, you had prepared a

18   corrected brief?

19           MR. FELDMAN:  I prepared a brief that I thought was

20   correct, but I was not yet -- at the time, I spent all day in

21   front of my computer.  I did not have time to go to the court

22   to cite check to make sure that the cases I was citing was

23   correct.

24           THE COURT:  If you weren't in a place that you could

25   check the cites, how could you know that the citations were

P8MRFLYc

1    correct?

2         MR. FELDMAN:  I went -- what I would do is go to -- I

3    went back to each one of the citations that were identified by

4    Mr. MacMull, and I went to see exactly how -- I did my own

5    post-mortem to find out what and how those mistakes happened.

6    And, for example, and again I realized that, for example, the

7    case that involved the Poly --

8         THE COURT:  Poly-America, sir.

9         MR. FELDMAN:  Yes, Poly-America.  Yeah, it was

10   *Poly-America LP v. Stego Industries,* which was a Northern

11   District of Texas case, and *Polymer Tech. Corp. v. Mimran,*

12   which was a Second Circuit decision.

13        THE COURT:  Neither of which is the citation here,

14   sir.

15        MR. FELDMAN:  Correct.

16        THE COURT:  So within 24 hours, you had, as you tell

17   me, a substantially corrected draft prepared.  You're learning

18   on the 22nd -- let me make sure I have this correct.  5:53 p.m.

19   on Sunday, June 22, that's the date and time I'm reading from

20   Mr. MacMull's email.  Do you have any reason to dispute the

21   time of that email?

22        MR. FELDMAN:  He sent it -- I believe he was on

23   vacation when he sent it.

24        THE COURT:  OK.  So by 5:53 on Sunday, June 22, 2025,

25   you were aware that you had submitted to the Court citations to

P8MRFLYc

1    cases that did not exist, correct?

2         MR. FELDMAN:  At that time, I was aware that the

3    citations -- that was a problem of the citations, and I was

4    going to get to the bottom of it and inform the Court and file

5    an amendment.

6         THE COURT:  Yes, except you didn't tell me.  So by

7    Sunday night after you got that email, had you confirmed that

8    certain of the citations were to cases that did not exist, or

9    was that confirmation process done on Monday?

10        MR. FELDMAN:  The confirmation process was done Sunday

11   through Sunday night.  And then on Monday, I contacted

12   counsel -- other counsel to confer as to how to proceed with

13   this -- with the -- how to proceed with addressing it to the

14   Court, what the appropriate way to do it was and how to do it.

15   That's what I did.

16        THE COURT:  On the 23rd of June, that Monday, you did

17   not advise me that you had filed a submission on Friday that

18   included cases of cases that did not exist, is that not

19   correct?

20        MR. FELDMAN:  I was given until 5:00 p.m. to make that

21   that, and I spoke to counsel and I was advised by counsel --

22        THE COURT:  "Advised by counsel," by what counsel?

23   Your counsel?

24        MR. FELDMAN:  I consulted with other attorneys, with

25   colleagues.

P8MRFLYc

1          THE COURT:  I see.  On this case or elsewhere?

2          MR. FELDMAN:  This case.

3          THE COURT:  With counsel sitting next to you?

4          MR. FELDMAN:  I mean, I sent -- I asked Mr --

5          THE COURT:  You asked Mr. MacMull to give you his

6     cases and cite check your brief.

7          MR. FELDMAN:  No.  I asked Mr. MacMull to -- in that

8     case, I asked him to check my brief to run it through the same

9     citation reporter he used.

10          THE COURT:  Right, which was certainly not his

11    obligation.  My point remains, sir, on the 23rd of June, you

12    did not tell me that you had filed a brief that contained

13    citations to cases that did not exist.

14          MR. FELDMAN:  I drafted my own letter to the Court

15    that I was going to send to the Court.  However, when I was

16    going to send a letter to the Court saying that I'm going to

17    correct it and send the corrected brief, I wasn't sure if it

18    was correct yet.  I was in the middle of drafting a letter.  I

19    spoke to counsel and asked whether -- at that point in time, I

20    was not aware yet to the extent what the -- I looked to see the

21    substance of what I was arguing and I looked at the case

22    citations, and at that point in time I felt that the errors

23    were in the case citations not in the substance -- not in the

24    substance of the arguments, that the cases that were -- the

25    cases I was citing to was incorrect, however the substance of

P8MRFLYc

1    the arguments that I was making at that time was correct, and

2    that the errors in citation should be addressed that way and

3    should be informed to the Court, which is what I wanted to do

4    on Monday.

5         THE COURT:  Which you didn't do on Monday, sir.

6         MR. FELDMAN:  Because Monday was -- because then, at

7    that point in time, I knew that Mr. MacMull would not run his

8    check cite in Westlaw.

9         THE COURT:  He had no obligation to --

10         MR. FELDMAN:  Absolutely.

11         THE COURT:  No, but you chastised him in your emails

12    for declining to give his cases to you and for declining to run

13    a cite check on your submission.  He had no obligation to do

14    that.  I want you to answer my question.  You did not tell me

15    on Monday, June 23, that you had submitted a brief that

16    contained citations that did not exist.

17         MR. FELDMAN:  That is correct.

18         THE COURT:  On Tuesday, you still did not tell me.  On

19    Tuesday, you did not send me a letter telling me that you had

20    filed a brief that contained citations to cases that did not

21    exist, true?

22         MR. FELDMAN:  True.  On Tuesday, I was revising

23    my papers, true.

24         THE COURT:  On Wednesday, June 25, you did not tell me

25    that you had filed a brief that contained citations to cases

P8MRFLYc

1    that did not exist?

2            MR. FELDMAN:  On Wednesday, I -- was Wednesday the

3    date that Mr. MacMull contacted the Court?

4            THE COURT:  No, sir.  I believe that is Thursday,

5    June 26.  Let me just confirm.

6            MR. MacMULL:  I'll so stipulate, your Honor.

7            THE COURT:  I just wanted to make sure it was a

8    Thursday, and it was.  Yes.  It was a Thursday.  Monday is the

9    23rd.  You keep me in the dark.  Tuesday you keep me in the

10   dark.  Wednesday you keep me in the dark.  Thursday you keep me

11   in the dark, and it is not until Mr. MacMull advises me -- will

12   you acknowledge, sir, that the first time I'm made aware that

13   you have cited cases that do not exist is when Mr. MacMull

14   tells me on the 26th June?  You never told me before then?

15           MR. FELDMAN:  I did not tell you.

16           THE COURT:  You made a conscious decision not to tell

17   me.  Yes, yes.  I don't know why you did that, but you

18   refrained from telling me.

19           MR. FELDMAN:  I made a conscious decision to tell you.

20           THE COURT:  You never told me, sir.

21           MR. FELDMAN:  I had a letter --

22           THE COURT:  You never submitted a letter, sir.  That's

23   like a tree falling in the forest.  You did not submit a

24   letter.  You did not let me know.  He threatened -- not

25   threatened.  That's an overstatement.  He let you know that he

P8MRFLYc

was going to tell me.  You didn't even bother then to tell me.

He sends you an email on the 26th of June at 2:58 p.m.  "Mr. Feldman, clearly continuing to engage with you in connection with this matter is not productive.  Accordingly, we'll proceed as we deem appropriate."  You didn't tell me, and I don't know why.  Well, you've given me an explanation, but there's no real reason why you should have kept this from me.

MR. FELDMAN:  I drafted and redrafted my letter to the Court.

THE COURT:  That you never gave to me.

MR. FELDMAN:  Because at that time, it was too late because the Court already wrote its order to show cause.

THE COURT:  Sir, you had four days to tell me before Mr. MacMull did, and you chose not to.  You didn't have to give me a corrected brief then.  You simply could have said, Failla, there's a problem with my brief.  I need to submit a corrected one.  You didn't even bother to do that.  You knew, as of the night of the 22nd, that there were problems with your submission, and you never told me.  That's correct.  I had to learn from Mr. MacMull that you had filed a brief with improper citations, yes?

MR. FELDMAN:  I wasn't sure what to do.

THE COURT:  How could you not be sure what to do?  You wanted me to persist -- you let me live for actually six days thinking that you had filed a proper brief when you hadn't.  I

P8MRFLYc

1   don't know why you think that you needed to wait.  I don't want

2   to know your conversations with counsel.  I don't understand

3   how you thought it was appropriate to keep me in the dark, but

4   you did.

5          MR. FELDMAN:  I did not think -- I thought it was

6   appropriate to give you a full accounting of what happened, and

7   I thought that I should clarify exactly what was right and what

8   was wrong and then let you know that.

9          THE COURT:  Yes, but then you didn't.  Because you did

10  submit a response to the order to show cause on July 11, which

11  is when I get your accounting of what happened.

12         Now, to be clear, in your emails with Mr. MacMull, you

13  made citations to your repository of cases, which is why I

14  asked you earlier about the repository of cases.  But I don't

15  actually see how any of the citation errors could have been the

16  product of your reliance on your repository of cases because

17  presumably that repository is of real cases with real

18  citations.  So how does the repository enter into the fact that

19  you submitted briefing to me that contained citations to cases

20  that did not exist?

21         MR. FELDMAN:  I had 60 citations in the brief.

22         THE COURT:  Yes.

23         MR. FELDMAN:  And 14 of those citations were citations

24  that Mr. MacMull brought attention to.

25         THE COURT:  Yes.

P8MRFLYc

1          MR. FELDMAN:  So of those 44 citations, those were in

2     my repository.

3          THE COURT:  I see.  OK.  So the repository isn't to

4     blame for anything.  You're saying the repository is the source

5     of your good citations.

6          MR. FELDMAN:  I'm saying that the repository is the

7     source of the work that I was working on and that I was

8     referring back to.  For example, there was a Poly case, which

9     later on was deemed something else.  There was the S'well case,

10    which has another name to it.  The Storm Tech [sic] case also

11    had another name to it.  These cases are cases that I have and

12    those cases —— and I said this before —— a significant portion

13    of those cases was based on a repository of cases that I had

14    already researched in the past over the years that I've been

15    dealing with Amazon-related matters.  Not having actually dealt

16    with it in court but having investigated cases that clients

17    come to me and asking what are my rights, what aren't my

18    rights.  And at the time, I did the research on each of those

19    cases.  It was way before AI even existed or at least I was

20    aware of it.

21         THE COURT:  All right.  Sir, with respect to your

22    response to the order to show cause —— again, it's filed with

23    me on July 11 —— to what degree did you use AI in the

24    preparation of this response?

25         MR. FELDMAN:  To a -- in terms of the -- I compiled

P8MRFLYc

1    all of -- I went to the law library, and I went to research the

2    New York State Bar Association reports.  I also pulled

3    Mr. MacMull's articles that he wrote specifically.  I also went

4    through the various cases, the *Mata* case and some of the other

5    cases.  I also went through some of the other cases that were

6    involved.  And in that instance, I put together all the cases

7    that I was going -- that I was going to use, and I began to

8    prepare a formal response including a basically line-by-line

9    correction of the citations explaining or telling what they

10   were.

11        At that point in time, I felt that: (1) every time you

12   put a citation online that is incorrect, there's a potential

13   that someone else is going to be citing to it, so what I

14   decided to do was remove any -- to change it to be more of a

15   personal letter where I was focused on that my conduct and also

16   the error that I made, which -- and at that point in time, I

17   proceeded to change the -- to change it from being a fully

18   cited motion to being more of a letter to the Court.

19        And at that point in time, the -- what I then did was

20   I went to check to see -- I put together all the information in

21   what's called a NotebookLM, which is a closed repository -- I

22   guess, repository.  Basically, I put in the original documents

23   and confirmed that if there's anything in there that is correct

24   or if it was correct, it would give me the exact citation of

25   the source.  And if it was incorrect, it would not -- it would

P8MRFLYc

 1  tell me that it's not correct.  So that's what I did to fix it.

 2       It was basically I drafted my letter.  I did my

 3  research.  I didn't cite to Irving Finkel, but I definitely did

 4  my own research.  I read Ray Bradbury many years ago,

 5  *Fahrenheit 451*, I felt that that was for me, the importance

 6  of -- that's where I wanted to -- and I also felt that it was

 7  important to include my personal things.  None of those -- none

 8  of that information was in the repository, but in terms of my

 9  reference to the information that was in the CLE materials that

10  I reviewed in terms of the cautioning of using AI, in terms of

11  the proper or improper usage of it, I also referred to to try

12  to understand, you know, better how Westlaw citations, again, I

13  had -- much of that was in the repository, so I kept it there.

14       For example, I had to refer back to it and say is this

15  quote, the exact quote that I have that is there, and if it's

16  not, I ran it against that to make sure that it was correct.

17  But ultimately I did not -- I chose to make it a personal

18  letter where there's no -- where I was not going to be citing

19  to anything.  Unfortunately, I had a quotation there that was

20  in fact not -- it was -- when I removed it -- when I thought I

21  removed it, I thought I removed the quotation.  I thought it

22  was going to be more personal.

23       THE COURT:  That's even more confusing because the

24  quotation -- you told me a moment ago that you read the *Mata*

25  case and other cases, but you ended up quoting to an article

P8MRFLYc

1    about them and not the case itself.

2            MR. FELDMAN:  I did not -- I wanted to cite to the

3    literature that was out there.

4            THE COURT:  But you didn't identify it as literature.

5    You didn't identify it as an article about the case.  You

6    identified it as the case.

7            MR. FELDMAN:  So I originally, in my draft, I actually

8    have the citations to the article, and I went through and I

9    changed it.  I actually removed all citations.  I thought I

10   removed all citations except for the citations that I was

11   referring to with Ray Bradbury and with the biblical citations

12   and also from the article to -- the British Museum, I think it

13   was.  I don't remember if I actually kept it into the final

14   version.  Originally I was going to cite to it, but I couldn't

15   find the initial --

16           THE COURT:  But sir, what would have been problematic

17   about citing to *Mata*, which is an actual case?  You are saying

18   now you wanted to remove cites to it.  I don't quite understand

19   why what you cited to is not *Mata* but an article about *Mata*.  I

20   agree with you that there's no utility in perpetuating false

21   citations, but *Mata* and *Park*, they're real cases.

22           MR. FELDMAN:  When you referred to it, I didn't

23   make -- I mentioned *Mata*.  Originally I mentioned *Mata* as a

24   separate -- meaning, I was citing to it separately.  And then I

25   was going to cite to the secondary material that took lessons

P8MRFLYc

1  from *Mata*, but instead I decided to refer to *Mata* just in

2  general as the case that is existing that is an important case,

3  and I was going to just make the point, which I mistakenly did

4  not -- when I was making my edits, I missed the -- I missed

5  the --

6      I think it was I left in a quotation.  There's a comma

7  over there.  That comma there before the quotation was supposed

8  to be was supposed to be removed.  It was supposed to be

9  removed and whatever.  It was supposed to be put in.  It's a

10  run-on sentence, and I missed it.  I didn't realize.

11      THE COURT:  Sir, repeatedly, you suggest to me that I

12  should be mindful of the fact that "immediate corrective action

13  was taken upon discovery with a substantially corrected draft

14  prepared within 24 hours."  That draft was not submitted to me

15  with your response to the order to show cause, is that not

16  correct?

17      MR. FELDMAN:  I wrote that I would submit it if the

18  Judge wanted me to.

19      THE COURT:  You did not offer it to me between the

20  23rd of June and the 11th of July.

21      MR. FELDMAN:  At that point in time, I was responding

22  to the order to show -- I felt that I was supposed to respond

23  to the order to show cause and not do anything further until

24  the -- I felt that the Court was notified by Mr. -- not the --

25      THE COURT:  Sir, you are repeatedly telling me that

P8MRFLYc

 1    you had a corrected draft, but you never showed me the

 2    corrected draft.  At some point, I told you I did not see it,

 3    but until that moment, you kept repeating it but never showed

 4    it to me.  I actually have no knowledge as to whether this

 5    corrected draft exists.

 6              MR. FELDMAN:  So it was not included when Mr. MacMull

 7    forwarded it to the Court.  It is in the email he forwarded,

 8    but he did not actually forward the draft I sent to him,

 9    which --

10              THE COURT:  I imagine he felt it was not his place to

11    send your work product to me.

12              MR. FELDMAN:  Selective.  I guess he -- that's fine.

13    But I didn't think any of the conduct --

14              THE COURT:  Wait.  Did you think it was Mr. MacMull's

15    obligation to forward your corrected brief to me?

16              MR. FELDMAN:  No.  I thought it was inappropriate to

17    forward our personal correspondence to the Court.

18              THE COURT:  Well, no, actually I think it's quite

19    illuminative.  You had given him the draft, but you had not

20    given it to me.

21              MR. FELDMAN:  I did mean to give it to you.  But at

22    that point in time as things were in flux originally, what I

23    wanted to do was I was going to ask the Court to amend it, but

24    amend it substantively as opposed to --

25              THE COURT:  Yes.  That was impermissible because you

P8MRFLYc

1    were going to be submitting a completely different thing.  You

2    were trying to capitalize on your submission that contained

3    false citations.  You wanted the opportunity to submit an

4    amended brief that included new arguments.  That was

5    impermissible.

6           MR. FELDMAN:  Your Honor, I specifically -- that's why

7    I requested relief for that -- not for that because but for the

8    purpose of recognizing that the information that I -- the

9    arguments that I had were moot -- were moot.  And so submitting

10   a brief with corrected citations that were not going to be --

11   that were no longer relevant at that point in time, especially

12   after -- I don't remember when, but at some point in time, I

13   realized just sending a corrected brief was not what I needed.

14   I really needed to do what I did on Friday which was actually

15   amend -- fully amend the brief and correct it, and ask the

16   Court for more time, which is what I needed.

17          THE COURT:  Which is not what you did.

18          MR. FELDMAN:  Which is not what I did.

19          THE COURT:  So going back to my earlier question:  To

20   what degree did you use AI in the drafting of your response to

21   the order to show cause?

22          MR. FELDMAN:  I used NotebookLM to review the content

23   of my -- to review the content that was referring to whatever

24   I -- it was consistent with my interpretation of the cases and

25   the material that I reviewed from the bar association and from

P8MRFLYc

1  the ethical -- from the ethical decision -- from the secondary

2  related to the ethical use of AI.

3          THE COURT:  Other than the quotes that are contained

4  in this document, is every word in this document written by

5  you?

6          MR. FELDMAN:  I believe so.  And again, yes, other

7  than the quotes that I was paraphrasing -- if I was

8  paraphrasing something, it's not a quote.  It was not written

9  by me but written by someone else.  But it was an actual line

10  that I put in myself.

11          THE COURT:  And your foray or your discussion on the

12  ancient libraries of Ashurbanipal, A-s-h-u-r-b-a-n-i-p-a-l,

13  that came from you?

14          MR. FELDMAN:  It came from me.  It came from me from

15  research that I reviewed from the London Museum from Irving

16  Finkel's review of the Assyrian script.

17          THE COURT:  Now, there's no reference to the London

18  Museum in this document, is that not correct?

19          MR. FELDMAN:  I did not cite to it.

20          THE COURT:  There's no reference to Mr. Finkel in this

21  document.

22          MR. FELDMAN:  I did not cite to him.  I did not intend

23  to.  There was a phrase I was going to cite to him, which was

24  the pen is mightier than the sword.

25          THE COURT:  Yes.

P8MRFLYc

1            MR. FELDMAN:  But actually when I went back to listen

2       to his recording, he did not say the pen is mightier than the

3       sword, so I did not cite to it, and I didn't believe there was

4       any reason for me to cite to it at the time.  It was not based

5       on his information only.  It was based on multiple sources.

6       It's an area of interest that I have always looked into, and

7       given lectures about it, but most of it is my own unscientific

8       thoughts about various things.

9            THE COURT:  You told me that you transmitted a

10      substantially corrected draft memorandum to cocounsel for

11      collaborative review.  What did you expect him to do?

12           MR. FELDMAN:  I thought he would run it through -- the

13      same way he took my original motion and used it to me-too it

14      and say, here we go.  He then told me he could not me-too it.

15      You are tell --

16           THE COURT:  Yes, but you are telling me on July 11

17      that you sent it to him for that purpose, not telling me that

18      he declined to do it.

19           MR. FELDMAN:  I didn't -- I felt that it would be

20      unnecessary for me to call attention to his refusal to help me.

21           THE COURT:  OK.  But instead what you did, you

22      attempted to leave me with the misimpression that somehow this

23      is being reviewed by cocounsel.  That's what you did.  By

24      telling you sent it to them for their collaborative review and

25      not telling me that they declined your request for

P8MRFLYc

1    collaborative review, I'm left with the misimpression that you

2    were getting assistance from your cocounsel on the corrected

3    brief.

4         MR. FELDMAN:  That was not intended.

5         THE COURT:  I'm not sure how I could have come to any

6    other conclusion, sir.

7         All right.  So did you get any collaboration on your

8    substantially corrected draft memorandum that you submitted to

9    cocounsel?  Did you submit it to anyone other than Mr. MacMull?

10        MR. FELDMAN:  I was going to submit it to plaintiff

11   before I submitted it to the Court.

12        THE COURT:  That wasn't my question.  My question was:

13   Did you submit it to anyone other than Mr. MacMull?

14        MR. FELDMAN:  I did not submit it to anyone because it

15   ended up it needed more.  It needed to be corrected, and I

16   needed to go to Westlaw to make sure it was correct.

17        THE COURT:  Which you said you did within 24 hours.

18        MR. FELDMAN:  I couldn't go to --

19        THE COURT:  You said "substantially corrected draft

20   memorandum."  It wasn't really substantially corrected, sir, it

21   seems, or at least not within 24 hours.  OK.  But understand

22   that this very much leaves the misimpression that somehow you

23   were having someone check your work to make sure it was not

24   problematic when, in fact, he declined to do so.

25        MR. FELDMAN:  That was not the impression that I meant

P8MRFLYc

1    to give.

2         THE COURT:  And yet, it is the impression that you

3    left me with.

4         All right.  So this is the point where you are telling

5    me you want to amend.  There's some fighting about whether to

6    amend.  My recollection is that plaintiff's counsel was opposed

7    to the request, so they wrote something the same day saying,

8    don't let them do it.  You wrote back a few days later, and

9    then I set the conference.  So again, I'm hearing you say under

10   oath that every word of this other than the quotes is yours.

11        MR. FELDMAN:  As far as I recall, yes.

12        THE COURT:  And that in no way did you use generative

13   AI to draft any portion of this brief.

14        MR. FELDMAN:  I used generative AI to confirm that the

15   information that I wrote was correctly referencing the

16   information that I had.

17        THE COURT:  In August you sought leave to file a reply

18   brief, which again was interesting, given that I had not yet

19   approved your original brief.  And you filed a brief that

20   contained, again, a case that was wrong.  Your proposed reply

21   brief cited to the case *Himmelstein*, H-i-m-m-e-l-s-t-e-i-n.  It

22   was a case, as we noted a little while ago, that you actually

23   cited correctly in your premotion letter.  I do not understand

24   how -- let's be clear.  There are three errors with this

25   citation.  Error one is that the defendant is incorrect.

P8MRFLYc

1    Actually, there are four errors.  The plaintiff is incorrect.

2    The defendant is incorrect.  The case citation is incorrect,

3    and it purports to affirm a District of Columbia case that is

4    incorrect.

5         I'm just going to pull up your memorandum of law so

6    that I can see it again.  Candidly, it's ridiculous on its face

7    because it does seem strange to me that it is affirming --

8    well, wait a minute.  Let me take that back.  It is affirming a

9    decision the District of Columbia issued some six years

10   earlier.  I find that interesting.  But if you pull up the

11   cite, the 908 F.3d 49 cite is to a criminal case, *United States

12   v. Camara,* C-a-m-a-r-a, and then the DDC case that you cite, 44

13   F. Supp. 3d. 1, is a case involving Humane Society.  So every

14   part of that citation is wrong, and I don't quite understand

15   how it came to be so wrong.

16        You cited it correctly once previously.  You were

17   citing to a decision that had been cited by your adversaries

18   and your colleagues.  It was a reported decision.  So your

19   statements to me, what you say to me, is the challenge that

20   you've been struggling with is concerning the verification of

21   unreported citations.  This was a reported case that you

22   somehow correctly cited months earlier, but couldn't correctly

23   cite this time.  What happened?

24        Let's also acknowledge that you're responding to the

25   citation to *Himmelstein* in the briefs of plaintiff and the

P8MRFLYc

1    briefs of your codefendant.  It is cited correctly at pages 16

2    and 17 of the plaintiff's opposition.  It is cited correctly at

3    pages 26 and 27 of Top Experience's brief.  How possibly could

4    you have gotten it wrong?

5          MR. FELDMAN:  When I was doing my reply, there were

6    two things that I was trying to do, which was -- one, was to

7    make my arguments but also to tailor my arguments to limit them

8    to what was covered by the other parties.  So the purpose of my

9    citation to -- my -- what I intended to do was quote directly

10    from the citation that was in plaintiff's -- that was in

11    plaintiff's opposition that cited to defendant MacMull's

12    citation.  It was not intended to -- I was -- essentially I

13    copied and pasted that information from the MacMull -- sorry --

14    from the Flycatcher opposition to show the context, and I was

15    not arguing the case itself.  I was arguing that they

16    themselves said that the parties -- that plaintiffs -- that

17    plaintiffs made that case.

18          So when I subsequently went through the -- when I went

19    back to then do my table of authorities and to correct it, what

20    I did was I then took out all the cases that I cited to and put

21    them into an Excel spreadsheet.  In the -- at some point in

22    time between when I was -- I went through each one.  I went

23    through each case.  I downloaded -- I went to PACER to download

24    every single case.

25          I also went to PACER to try to download ―― I don't

P8MRFLYc

remember the name of the case —— one of the cases that were

cited that were decided on March 27 of 2007.  I was not able to

find -- I was not able to find a -- I was not able to get the

original PACER decision for that case because it was -- that

dated range was sealed, so I wasn't able to confirm that.  So I

basically was going through every single case, making sure that

they were cited correctly.

THE COURT:  So the case to which you speak is the

*Klein-Becker* case.  I'm not concerned about that, sir.  I'm

asking you why when the plaintiff correctly, at page 16 of

their brief, cites to *Himmelstein* case and your codefendant

correctly cites it, and you're saying you are just cutting and

pasting the citation, how did you get it wrong?

MR. FELDMAN:  What I did was I had each citation

separately in the document.  What I was doing is I was -- I had

the -- when I looked up the citation, I had -- I was looking

at -- again, I was looking at the -- I looked for *Himmelstein*

to look up the *Himmelstein* case, and what I did, I was I just

went to -- again, I wasn't looking at it in -- it must have

been like 5:00 in the morning or something like that.

I was looking at just the citation itself.  I wasn't

thinking about it for purposes of the substance of what was

there.  So I was going through each citation making sure the

citation was correct.  I was not looking at it for purposes of

the -- so I already had the original case.  I downloaded it.

P8MRFLYc

1    The *Himmelstein* case, I had from the past.  I actually

2    downloaded it the night before at 7:00 -- 11:00, sometime in

3    the evening, amongst the other cases to make sure I had every

4    other case, the original case that was there, and to make sure

5    that I was citing to the right non-Westlaw reporter where

6    possible.

7              THE COURT:  Mr. MacMull, excuse me.  I can hear you,

8    and I don't think you mean me to.  Thank you.

9              Mr. Feldman, please continue.

10             MR. FELDMAN:  So the *Klein-Becker* --

11             THE COURT:  No, no.  I'm not thinking about the

12   *Klein-Becker* case.  That one matters less to me.

13             It's the *Himmelstein* case, sir.  You say that the way

14   you checked it is by running a check with Google, but there are

15   three citations in the screenshot you gave to me.  The first

16   one is correct.  The second one is correct.  You picked the

17   third.  Why?

18             MR. FELDMAN:  So that was not -- when I got the third

19   one, it wasn't -- my point was that when I searched for

20   consumer and -- I don't remember what it was that I was

21   searching for when I was looking to confirm that I had the

22   right citation.

23             THE COURT:  You put Himmelstein Consumer, sir.

24             MR. FELDMAN:  Yes.  So Himmelstein Consumer, the case

25   that is involved was Himmelstein v. ⸺ I believe ⸺ Comcast.

P8MRFLYc

1          THE COURT:  That's the case that it isn't.  That's the

2    wrong citation.  That's the one you chose.

3          MR. FELDMAN:  So the reporter -- and the reason is the

4    reporter of the citation of Himmelstein in my excerpt, when I

5    jotted it down, I jotted it down as the, you know, 49 F. Supp.

6    or F.2d, whatever the original citation for the Himmelstein

7    case was, I wasn't sure of the full citation, so I had comma

8    44.  I think I was trying to just confirm.  And then what

9    happened was that I took that citation, and I couldn't find --

10    again, I was looking only at the citation itself.  It wasn't

11    looking at the case for its substance, and I was trying to find

12    how I could -- I lost track between the section, the citation

13    part and the reporter part and the -- which I thought was a --

14          THE COURT:  That makes no sense to me at all, sir.

15          *Himmelstein* is a decision of the New York Court of

16    Appeals on General Business Law, Section 349.  The Himmelstein

17    case you cited is a Fair Credit Reporting Act case.  They are

18    not in any way -- they may in the broadest sense both involve

19    consumer statutes, but I cannot fathom how you could have

20    gotten that so wrong.

21          MR. FELDMAN:  I was trying to -- when I was going

22    through it, I was looking at it for the purposes of

23    understanding what -- I had the wrong citation there when I was

24    using that excerpt.  And in looking up that excerpt, I found

25    the Himmelstein case, not remembering the Himmelstein case that

P8MRFLYc

1    I had, the night before, already downloaded.

2            THE COURT:  That makes no sense to me.  Also, if the

3    point is you told me in your response to your order to show

4    cause that basically you've learned from this awful experience

5    and that "comprehensive verification protocols have been

6    implemented to prevent recurrence."  And here you write "to

7    ensure such errors do not recur, I have implemented systemic

8    procedural safeguards."

9            They are clearly not working.  I cannot believe you

10   when you say you've implemented verification procedures because

11   there aren't that many citations in your brief.  You're citing

12   to something that was a key issue in your adversary's briefing,

13   and I don't know how you couldn't figure out to cite enough of

14   the case so that you could get the proper citation,

15   particularly when you cited it yourself.

16           MR. FELDMAN:  I had the exact quote from the original

17   PDF, which I originally took, and then what I did was I took

18   that quote from the PDF.  I did OCR on it, and copied and

19   pasted into the text document.  When I had it in that text

20   document, at that point in time, I stopped.  And then when I

21   went back to go through the -- to put it in there, I did not --

22   I was not thinking about the case itself.  I was just looking

23   to make sure that it was the correct citation because it was

24   copied from --

25           THE COURT:  But, sir, it wasn't the correct citation.

P8MRFLYc

1          MR. FELDMAN:  I went to check to see the case.

2          THE COURT:  You didn't.  You put in Himmelstein

3   Consumer.  It gave you the right answer, and you took the wrong

4   answer.  You skipped the two correct answers and took the wrong

5   one.  There's no justification for that.  I don't understand

6   how you suddenly thought that in a case discussing New York

7   law, you should be quoting to the District of Columbia.

8          MR. FELDMAN:  It was -- I was thinking about consumer

9   protection and that case involved a consumer who did not return

10  a VCR or something, and he was being sued by Comcast for -- he

11  was reported by Comcast for $400 in non-payments.  And I

12  thought, I was like, OK, maybe that's why it was cited.  I did

13  not remember.

14         THE COURT:  It was the third cite.  How did you not

15  look at cites one and two, which were the correct cites?

16         MR. FELDMAN:  That isn't the way I searched for it.

17         THE COURT:  That was the way that you told me you

18  searched for it.

19         MR. FELDMAN:  That was --

20         THE COURT:  Stop interrupting me, Mr. Feldman.  It

21  really is getting annoying.

22         Mr. Feldman, you tried to explain it by giving me

23  Exhibit A, which is the opinion you downloaded, and by giving

24  me a screenshot of what you did.  Now you're telling me this

25  isn't what you did.  Now you're telling me there's more than

P8MRFLYc

1    what you told me you did.  But this is what you told me that

2    you did, and this is illogical.

3         For you to say that based on a search that returned

4    three cases, two of which were correct and the third which was

5    incorrect, that I should accept that you somehow in good faith

6    decided to pick the third one that was incorrect.  Now you are

7    telling me, oh, Failla, no, I did more.  That's not what you

8    are saying here.  This is what you told you that you did.

9         MR. FELDMAN:  The screenshot is not contemporaneous

10   with the actual drafting of my letter, which I did not notice

11   that it was not correct.  When I was alerted to it, I then went

12   back to see what possibly could have happened over here because

13   I was quoting directly from another -- I was quoting directly

14   from the brief, so I went back to check.  And I looked and I

15   saw that when I was going through the -- to do the check

16   citations manually, I did not -- I searched to see, OK -- you

17   know, I searched the case.

18        It was -- and I found, when I did the search for

19   Himmelstein, the case that came up was a DDC case, which I saw

20   before.  I was like, oh, I've made errors with DDC cases

21   before.  What is wrong?  What is going on here?  So I went to

22   double check, and that's when I went and found the Himmelstein

23   Consumer case.  I got confused, and I thought that that was the

24   case that was cited by opposing counsel rather than the case

25   that was foundational, which was cited multiple times and I

P8MRFLYc

1    cited by myself.

2              But I was not focusing on the case itself.  I was just

3    trying to make sure that the case was the correct citation.

4    And I had more trouble because when I had the comma when I was

5    putting together that thing, the comma, I thought that I was

6    supposed to be citing to an appellate case, and I checked to

7    see how, what is the right way to write a subsequent --

8    subsequent things that are -- when you are referring to if a

9    case is appealed or something.  So I went to make sure that the

10   citation was correct.  I did not find it, and I checked to see

11   how to properly refer to it, and I put that in there.

12             THE COURT:  All right.  But sir, even if Himmelstein

13   v. Comcast was the correct site, and it, of course, was not,

14   the screenshot that you give me cites a citation of 931 F.

15   Supp. 2d. 48, which is not the citation that you gave, so

16   everything is wrong about that.  You cited to the *Camara* case

17   instead.

18             MR. FELDMAN:  The reporter from F. Supp. 3d became

19   F.3d or it became F.3d from F. Supp. 3d which I did not realize

20   and I did not realize I changed the entire citation check this.

21             THE COURT:  One moment, please.  No.  That can't be

22   because it is 931 F. Supp. 2d. 48.  That is the cite in the

23   screenshot that you gave me.  You then cited it as 909 F.3d 49,

24   and suddenly it becomes a D.C. Circuit decision rather than a

25   D.C. court decision.  And the other citation to it, which of

P8MRFLYc

1    course is not correct, is 44 F.3d 1, which is a District of

2    Columbia case from 2012.  So it can't be that you

3    mistranscribed something because the numbers are so off.  908

4    is not 931 and the F.3d is not the F. Supp. 2d.

5            MR. FELDMAN:  It was completely incorrect.

6            THE COURT:  Yes, it was.  You are showing me this

7    screenshot as some justification as how it became so incorrect,

8    and it itself is wrong.  You cannot explain to me from this

9    screenshot how you came to the citation that you got because

10   it's not there.

11           MR. FELDMAN:  I'm saying that I -- I'm saying that

12   that is an example of where you -- where the two cases come up,

13   the correct case and an incorrect case, and that when I was

14   searching just for the case with *Himmelstein*, which again is

15   not a very common name, I reflexively thought that it was

16   correct, not realizing I did it incorrectly.  When I copied and

17   pasted, I had it incorrectly, and when I --

18           THE COURT:  You are so incorrect as to have me

19   question what you actually did.  Because if you had, in fact,

20   put in *Himmelstein Consumer* into Google and gotten your case

21   that's from Google, which is problematic to begin with, had you

22   looked at these, I told you the first one was correct.  The

23   second one was correct.  The third was not the correct case.

24   But had you put in the cite 931 F. Supp. 2d. 48, you would have

25   gotten *Himmelstein v. Comcast* in the District of Columbia.  You

P8MRFLYc

 1    would have actually gotten a *Himmelstein* case.

 2             So I cannot understand, from the postmortem that you

 3    gave me as an explanation for why this was wrong, how you came

 4    instead to cite something completely different.  You cited 908

 5    F.3d 49.  There's nothing that tells me where that came from.

 6    That is the *Camara* case that you mentioned to you earlier, so I

 7    don't know where that came from.  I have to assume that this is

 8    another issue of you using AI to get cites.

 9             MR. FELDMAN:  I used -- so for that to get to the --

10    understanding how to properly cite the two -- the string

11    citation, which was *Himmelstein* v., in this case, *Comcast*, and

12    properly put in what I had, which was the comma 42, which was

13    because I had -- I didn't have the full, proper citation for

14    that case initially.  And, again, it was not a Google search.

15    It was Google Scholar.  If you put it Google Scholar and you

16    typed the words Himmelstein Consumer, because I was looking to

17    see the -- to make sure that the different DDC case that came

18    up, I couldn't find how I had this 42 F. Supp., but I couldn't

19    find the original citation but I thought that it was correct.

20             So I felt that I had to make sure that it was correct

21    in terms of the citation.  So I checked the case that with --

22    the string that I had, and the case search, cite case search

23    that I used, which is called citation -- citation checker,

24    which is an AI system, came back with a corrected string

25    citation that had AF, FDE with it, again, not correct.

P8MRFLYc

1    THE COURT:  OK.  It is correct that it was not

2    correct.  But I cannot understand how you could use so many

3    sources and come up with so many wrong answers when, in fact,

4    your adversaries gave you the proper citation.  That's all you

5    needed to work with.

6    But you tried to pivot to what you think is a broader

7    issue, and I just want to understand what you think I should do

8    about this.  You make a point of saying that while requiring

9    neutral case citations has not been adopted by either the blue

10   book or the circuit, it should not be assumed that everyone has

11   access to the walled garden of Westlaw and Lexis.  It seems to

12   me that you actually have access to the walled garden of

13   Westlaw or Lexis if only you would go to the law library to do

14   it.  I suppose another way of doing that is simply not to cite

15   Westlaw citations and deal with reported decisions.

16   But why does any of that matter here when the missed

17   citation was a reported decision?  What do you want me to do

18   with the fact that you don't have Westlaw?  It sounds like you

19   want me to say that you should be absolved of all of these

20   terrible citation errors, these missed citations, because you

21   don't have Westlaw.  But now I know you have access to Westlaw.

22   So what do you want?

23   MR. FELDMAN:  The access to Westlaw that I have is

24   limited to what was publicly available in the law library.  I

25   do not have full access.  When you wrote my reply, at that

P8MRFLYc

1    point, I did not have access to the law library.  And, again, I

2    was doing it manual -- I was manually checking, going through

3    each and every case.  That one, I thought that I made an error,

4    and I was trying to find the correct one and I could not find

5    the correct one.  I miscited it not realizing that I was not

6    doing it the right way.  But every single case I cited in

7    there, I took the -- I made the effort to make sure that they

8    were correct.

9         I'm not saying it's because of Westlaw.  I'm just

10   saying had I been able to do a check cite, it would have

11   immediately flagged it as incorrect because there is no such --

12   the way that I reported it --

13        THE COURT:  Even checking it on Google, sir, showed

14   you what the correct citation was.

15        MR. FELDMAN:  In hindsight, when I saw it then and

16   when I checked it, I saw it there.  When I had it in a text

17   unconnected to anything other than just simply the quote from

18   the other document, that I mistakenly put in there, I did not

19   realize that I had it incorrect.  I thought that that was my

20   corrected -- the corrected citation when, in fact, it was an

21   incorrect citation.

22        THE COURT:  Sir, I'm in Google Scholar right now.  How

23   do I get cases from Google Scholar?

24        MR. FELDMAN:  If you go to the left side, there's a

25   triple a hamburger to get case law.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P8MRFLYc

1          THE COURT:  And there it is.  So have you done that

2     again?  Each of the cases cited here, there are several

3     Himmelstein cases.  The first one is the case actually cited by

4     the parties, and it is properly cited here.  The second one is

5     as well.  The third one is the District of Columbia case

6     *Himmelstein v. Comcast* with the correct cite.  The fourth one

7     is another *Himmelstein v. Comcast* with the correct cite to the

8     District of Columbia.

9          MR. FELDMAN:  I thought that that was the -- the third

10    cite, the District of Columbia appeal, which was an appeal, I

11    thought that that was what I had originally and I miscited it.

12    When I ran that string citation, which I thought would be to

13    the Google Scholar version of the underlying case as well as

14    the appeals case, to see that it was correct, that was the way

15    that the check cite came back saying that's how it should be.

16         THE COURT:  That cannot be.  I hear you saying it, and

17    I don't understand how that can be but all right.

18         MR. FELDMAN:  I generally don't cite to -- again, I

19    was not citing to my own case.  I was citing to a quote, and I

20    missed -- when I was going through the quotes, I had an error.

21    I erroneously checked it, not thinking about the substance of

22    the case, just checking it.  I made a mistake.  I went to check

23    it.  I saw the --

24         THE COURT:  Sir, you are in the middle of a sanctions

25    proceeding for filing cases that don't exist.  I would have

P8MRFLYc

```
 1    thought that you would have been extra especially careful with
 2    citations to me, and you weren't in your response to the order
 3    to show cause and you weren't in the reply brief.  That's where
 4    we are.  I think that is where we are.
 5            I should note that I do want you to note you should
 6    obtain a transcript of this conference with whatever speed you
 7    think is appropriate.
 8            From my perspective, I've asked the questions I wanted
 9    to ask, and I have gotten the answers that I got.  I'm not
10    saying they are the answers that I wanted, but they are the
11    answers that I got.
12            Mr. Schwalb, I'm not going to let you question your
13    adversary, but if there's a subject matter area that you think
14    I overlooked, tell me now.
15            MR. SCHWALB:  No, your Honor.  I think you covered
16    whatever there is to be covered.
17            THE COURT:  Thank you.  Mr. MacMull, the same offer.
18            MR. MacMULL:  Thank you, your Honor.  The only
19    observation I'll make --
20            THE COURT:  I'll pause you there.  I'll let you make
21    observations in a moment.  If there was a subject matter I
22    didn't question him on, tell me.  Otherwise I'm going to
23    proceed to oral argument.
24            MR. MacMULL:  I'm sorry.  Oral argument on the motion?
25            THE COURT:  I'll offer the parties two things.  If you
```

P8MRFLYc

1    want to look at the transcript of this and write to me what you

2    think is an appropriate way of resolving my order to show

3    cause, I'll give you that opportunity.  Otherwise I'll hear you

4    from you orally now.

5        MR. MacMULL:  Oh, I see.  I misunderstood what your

6    Honor meant when you said oral argument.  In answering your

7    Honor's question, I don't believe substantively that your Honor

8    has omitted any line of examination.

9        THE COURT:  Thank you.

10        Mr. Feldman, how do you believe I should resolve this?

11        MR. FELDMAN:  I'm sorry.

12        THE COURT:  How do you believe I should resolve this

13    order to show cause.

14        MR. FELDMAN:  I would ask that the Court -- I would

15    ask that the Court consider the errors that I made; that the

16    errors I made were gatekeeping were, in fact, done; and that to

17    the extent that there were any errors that I have made, I will

18    endeavor to continue to correct them, and I will endeavor to

19    put in other -- to improve the way I am doing it.  I have also

20    solicited other counsel to assist me with either being able to

21    join them in access to citation reporters, but also to help me

22    with my general writing issues that I've had in terms of just

23    the kind of things that I should have done and also to avoid

24    any use whatsoever of any, you know, artificial intelligence or

25    LLM type of methods, including Vincent AI or Paxton AI or

P8MRFLYc

1    CoCounsel, but to only use the original cases themselves that

2    I'm citing.  And to the extent that I cite to any other cases,

3    that I put into effect I have learned that I cannot rely on

4    certain things.

5         I also have recognized that although I know that

6    I'm -- I do make mistakes, but that first and foremost, when I

7    do make a representation to the Court, that I make a

8    representation accurately.  And to the extent that I do not or

9    don't, I would -- generally would want to make sure that those

10   are done appropriately, and that I have also looked into

11   getting additional help to ensure that before I am submitting

12   anything, I have other counsel who will assist me as a -- in an

13   associate capacity to make sure that any of my submissions are

14   done correctly, appropriately, and ethically.

15        THE COURT:  Sir, I should have asked you earlier.  I

16   don't think I asked this question fully.  To what degree, if at

17   all, did you use artificial intelligence in the preparation of

18   your reply brief?

19        MR. FELDMAN:  In the preparation of my reply brief?

20        THE COURT:  Yes, sir.

21        MR. FELDMAN:  The only artificial intelligence I used

22   in connection with preparing the reply brief was the formatting

23   of the citation that I had incorrect, checking -- in connecting

24   the lower decision F. 3d. -- Supp. 3d. to F -- whatever the

25   citation to the appeal is.  When it comes to the actual brief

P8MRFLYc

1    itself, I used, you know, the standard spell checking and other

2    tools that I used when I -- that are available within Office to

3    make sure, whether it's grammatical or any other, errors that

4    would come through would be correct.

5        THE COURT:  In your opening brief, did you use it as

6    well to assist in organizing your thoughts and in drafting?

7    Did you use it in any way to assist or organize your thoughts

8    in terms of drafting the reply?

9        MR. FELDMAN:  No.  I focused on narrowing things down

10   to purely the -- What it wrote is to narrow it down to the

11   issues addressed in the appeal.  What I did was I organized it

12   to point to -- I tried as much as possible to follow the

13   framework that I thought made sense.

14       THE COURT:  Again, just so that I'm clear, what you

15   wanted to do with the reply was to narrow it to the issues

16   addressed in the opposition.  Am I --

17       MR. FELDMAN:  Yes.

18       THE COURT:  OK.  Because of that, you did not use

19   artificial intelligence in the organizing of your thoughts or

20   the drafting of any portion of the reply?

21       MR. FELDMAN:  In the opposition report, I focused only

22   on the -- I focused on -- I did not use AI to form or draft my

23   brief.  I used AI to review my prior submissions, but I did not

24   use AI in order to draft the reply.  I used AI only to check

25   the citation that I improperly formatted to the citation that I

P8MRFLYc

1    used in the -- that I quoted.

2              THE COURT:  Did you use AI to summarize or in any way

3    organize the briefing that you had received from your adversary

4    or from your defendant cocounsel?

5              MR. FELDMAN:  Did I use AI to summarize the briefing?

6    No, I did not.  I actually got the -- I read through the

7    documents and I went through to see what the documents were.  I

8    think I may have uploaded to it -- I maybe uploaded it to

9    Westlaw to do -- check citations on them to make sure that the

10   citations were correct that I found.

11             THE COURT:  Wait.  I'm sorry.  You used Westlaw to

12   check citations for your adversary's briefing but not your own?

13             MR. FELDMAN:  No.  I used it to -- I couldn't do it on

14   mine because I ran out of time, but I did have the ability to

15   pull the citations to make sure that the case citations that

16   were relevant to the case, that I addressed them.

17             THE COURT:  You used Westlaw to check the citations in

18   your adversary's brief?

19             MR. FELDMAN:  In my own -- in everyone's brief.

20             THE COURT:  OK.  Except when you ran out of time.

21             MR. FELDMAN:  No.  When I drafted my own brief, my own

22   reply, I was relying only on my own on Thursday when I was

23   writing it and then on Friday when I finished it.

24             THE COURT:  Nothing prevented you from going to check

25   your citations with Westlaw after you had completed the

P8MRFLYc

1    drafting of your reply brief?

2            MR. FELDMAN:  I could not do it at that time.  The one

3    citation which I had incorrect, at that time, it was Thursday

4    night.  Friday morning at 5:00 in the morning, I was not able

5    to go to get Westlaw.

6            THE COURT:  Thank you.

7            Mr. Schwalb, I'll hear from you now.

8            MR. SCHWALB:  Your Honor, we submitted a letter on the

9    order to show cause --

10           THE COURT:  Yes.

11           MR. SCHWALB:  -- that Mr. Feldman's client shouldn't

12   be allowed to file the motion to dismiss and should answer the

13   complaint.  That's the position that we take.  I'm not -- I

14   haven't spoken to my client about what happened here this

15   morning, so I don't know if my client's position has changed.

16   But at the time, we were not asking for sanctions against

17   Mr. Feldman other than that.  Your Honor mentioned in papers

18   recently that your Honor is considering defaulting

19   Mr. Feldman's client.  I'm the plaintiff.  I take defaults if

20   the Court wants to give it.

21           THE COURT:  I can't do it just because you want it,

22   sir.

23           MR. SCHWALB:  OK.  That's where we are.

24           THE COURT:  All right.  Do you want the opportunity to

25   submit anything in writing?  You are not obligated to do so.

P8MRFLYc

1          MR. SCHWALB:  The only opportunity I want is to

2   discuss with my client and then to advise the Court whether --

3   if the Court would allow, whether we want to submit anything

4   else.  But for now, I don't think so.

5          THE COURT:  Let me do this.  I'll hear from you all

6   orally today.  By next Friday if you want to submit something,

7   you'll let me know.  It would be a rather short schedule for

8   the submission, and I would not be expecting opposition.  I

9   would expect simultaneous briefing on it.

10          MR. SCHWALB:  Thank you, your Honor.

11          THE COURT:  All right.  Mr. MacMull?

12          MR. MacMULL:  Thank you, your Honor.  I may have

13   misunderstood our prior colloquy, so hopefully I haven't waived

14   anything.  I only wanted to say that Mr. Feldman, of course,

15   made reference to certain conversations and interactions we

16   had.  In as much as the Court has questions about that, I'm

17   availing myself to your Honor's examination insofar as you have

18   any questions.

19          THE COURT:  There's some discussion, sir, that the

20   communications that you sent to me were subject to the common

21   interest privilege.  Do you wish to respond to that, sir?  I

22   could basically get a volume discount here on ethical issues.

23   But I presume that you would not transmit to me privileged

24   information you received in the course of a communication

25   protected by common interest.

P8MRFLYc

1          Please let me back up a moment.  I have to think

2     through this.  Does common interest actually apply in this

3     setting under New York's law?  New York has rather specific --

4     I guess it might because you are actual parties to the

5     litigation.

6          MR. MacMULL:  I didn't mean to cut off.

7          THE COURT:  No, go ahead.

8          MR. MacMULL:  It exists when, in fact, there's an

9     agreement between the parties.

10          THE COURT:  Yes.

11          MR. MacMULL:  The mere juxtaposition of the defendants

12     does not by itself create a common interest privilege here.

13     And my only comment is, your Honor, nothing that I have set

14     forth in Exhibit A, which is at docket entry 158-1, pertains to

15     anything involving any common interest privilege and the

16     substantive discussions that Mr. Feldman and I had regarding a

17     certain tact that he wanted to take that I disagreed with.

18          THE COURT:  All right.  I don't know, sir, that you

19     have a horse in the race on the issue of sanctions.

20          MR. MacMULL:  I do --

21          THE COURT:  All right.  I'll hear from you.  Whether I

22     ultimately agree with you as you speak to the issue will be for

23     another day, but go ahead.

24          MR. MacMULL:  I trust your Honor is aware of this, but

25     I recently read that there something approaching 300 decisions

P8MRFLYc

1    in this country wherein the issue of lawyers using AI has been

2    the subject of decisions, and in those decisions, there's a

3    range of sanctions but among them include fees.  And I

4    certainly will wait for your Honor's ultimate determination,

5    but I would ask that I be permitted to make a fee application

6    pursuant to either a violation of Rule 11(b) and/or 28 U.S.C.

7    1927.  I believe there has been a multiplication of proceedings

8    here that would have been entirely unnecessary if Mr. Feldman

9    had done what I asked him to do that Sunday night in June.

10            THE COURT:  All right.  Anything else, sir?

11            MR. MacMULL:  The one observation I will make, your

12   Honor, would this the time for me to make that observation?

13            THE COURT:  Now you can make the one observation, yes,

14   sir.

15            MR. MacMULL:  Very good.  And your Honor did notice

16   this previously in your Honor's order, but I just wanted to

17   call it your Honor's attention for purposes of the record.  You

18   asked Mr. Feldman at great length whether or not he had been

19   the only scribe in connection with his response to the order to

20   show cause.  I believe he testified that, in fact, he was in

21   the absence of quotations that are set forth in that order.

22   The only observation I wish to make with respect to that is

23   that the style of prose is significantly different than

24   anything else that he has submitted, not the least of which is

25   the letter to the Court in docket 166 in which the entire first

P8MRFLYc

1   paragraph of his letter is a single sentence and is laden with

2   a series of grammatical errors, which is entirely unlike the

3   style of writing and certainly the quality of the writing that

4   appears at docket 164.

5           THE COURT:  So noted.

6           Anybody want to say anything else?  Otherwise, I will

7   let you go.

8           MR. MacMULL:  I do have a question with respect to the

9   underlying motions, your Honor.

10          THE COURT:  Yes, sir.

11          MR. MacMULL:  Your Honor indicated in her last order

12  that you are not going to -- again, this is in connection with

13  plaintiff's surreply, just to be clear.  And that's docket

14  entry -- I can find in it a second.  The one observation I

15  would like to make, your Honor, is that could we please be

16  permitted to file by next Friday, nothing more than the single

17  page or two, with respect to the problems that we perceived

18  with the surreply, which is in essence that it addresses issues

19  that are not within the four corners of the third amended

20  complaint; namely, a warranty that apparently was included with

21  all the products but again is not the subject of anything

22  within the third amended complaint.

23          THE COURT:  I feel like you have just now done that,

24  sir, but let me say no for now because otherwise this briefing

25  will never end.

P8MRFLYc

1              MR. SCHWALB:  Can I respond to that or --

2              THE COURT:  No.  I can look at these things myself.

3    All right.  We're adjourned.  Thank you.

4              (Adjourned)

5                               o0o

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25