UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

FLYCATCHER CORP. LTD and FLYCATCHER TOYS, INC.,

                        Plaintiffs,

                        -v.-

AFFABLE AVENUE LLC, *doing business as* CJ DIST；
OZMOS COMPANY LLC; EYTAN GROSSMAN, *doing business as* EYG DEALS; CREATIVE REWARDS INC.; JOSHUA CHAVEZ, *doing business as* ONESTOPFASTSHOP; TOP EXPERIENCE COMPANY LLC, *doing business as* WE PAY COST LLC; PRETTY PRINCESS LLC, *doing business as* NORVI; AYANEE LLC; FORTUNA KG LLC, *doing business as* FORTUNAKG; JAXSON MANAGEMENT LLC; JOAN ALEXANDER SORIANO, *doing business as* PRIMECHOICEMART; A WAHABI CORPORATION, *doing business as* MCPROFITS; MODA ORIGINAL LLC; VALLEY BODEGA WHOLESALE INC.; EYAD WAHBY; SAM SHAMLOO; S&N GLOBAL SUPPLY INC.; VALUE VALLEY WHOLESALE LLC; ADAM HAMIDA; and JOHN DOES 1 to 25,

                        Defendants.

|  |
|--|
| 24 Civ. 9429 (KPF) |
| **OPINION AND ORDER** |

---

KATHERINE POLK FAILLA, District Judge:

In June 2025, Steven A. Feldman, counsel for Defendant Affable Avenue LLC ("Affable"), filed a brief in support of Affable's motion to dismiss that was peppered with false citations. Concerned about both the genesis of these misstatements and counsel's delay in correcting them, the Court issued an Order to Show Cause. Perhaps not appreciating the gravity of the situation, Mr. Feldman responded to that Order with a submission that appeared to have been created by generative artificial intelligence ("AI"), and that itself contained a false citation. The Court's response was stern and unmistakable: "Mr.

Feldman [wa]s not excused from this professional obligation [of verifying that the cases he submitted to the Court were valid] by dint of using emerging technology." (Dkt. #169 at 4).

Mr. Feldman persisted. A few days prior to the Court's hearing on the Order to Show Cause, Mr. Feldman submitted a proposed reply brief in further support of Affable's motion to dismiss. Once again, his brief contained false citations. And at the August 22, 2025 hearing, Mr. Feldman was unable to respond directly to, much less answer, the Court's questioning about his submissions.

Mr. Feldman has not, and apparently cannot, learn from his mistakes. And while the Court does not oppose the use of AI to assist in legal research and writing, it must take a stand where, as here, counsel repeatedly files submissions with false citations because counsel refuses to verify those submissions. This Court can do no more. For the reasons that follow, the Court sanctions Mr. Feldman pursuant to Federal Rule of Civil Procedure 11 and the Court's inherent powers by striking Affable's submissions and entering default judgment against it.

## BACKGROUND

### A.    Plaintiffs' Complaints and Defendants' Motions to Dismiss

On December 11, 2024, Plaintiffs Flycatcher Corp. Ltd. and Flycatcher Toys, Inc. (collectively, "Flycatcher") filed a five-count complaint alleging federal claims for trademark infringement and unfair competition, as well as state- and common-law claims for deceptive trade practices, fostering the sale of stolen

goods, and unfair competition. (Dkt. #1). Over the next year and a half, Plaintiffs amended their complaint several times before eventually filing a Third Amended Complaint (the "TAC") on May 23, 2025. (Dkt. #142).

On June 20, 2025, Defendants Top Experience Company LLC ("Top") and Affable each separately filed motions to dismiss the TAC. (*See* Dkt. #150-152 (Top's motion to dismiss and supporting documents); Dkt. #153-156 (Affable's motion to dismiss and supporting documents)).[1] That is where the trouble began for Affable's counsel, Mr. Feldman.

## B.    Top Alerts Affable and the Court to Disconcerting Errors in Affable's Brief

On June 26, 2025, counsel for Top, Joel MacMull, submitted a letter to the Court expressing concern that Mr. Feldman had "us[ed] an artificial intelligence ('AI') large language model such as ChatGPT" to write Affable's brief, resulting in significant errors. (Dkt. #158 at 2). In particular, Top alerted the Court to a series of faulty citations in Affable's brief: at least thirteen cases Mr. Feldman cited that did not exist, and eight cases that did exist but did not contain the quotes Mr. Feldman attributed to them. (*Id.* at 1; *see also* Dkt. #158-1 at 9-10 (email from Mr. MacMull to Mr. Feldman specifically detailing each erroneous citation)). Additionally, Mr. MacMull pointed out, Affable's brief began with a three page "Introduction," but was

---

[1]    On July 8, 2025, Defendant Valley Bodega Wholesale Inc. ("Valley Bodega") joined Top's motion to dismiss. (Dkt. #163 (Court permitting Valley Bodega to adopt Top's brief in support of its motion to dismiss as a brief in support of Valley Bodega's own motion to dismiss)). The Court has resolved Top's and Valley Bodega's motion to dismiss in a separate Opinion and Order issued today.

then followed by a separate and largely duplicative "Preliminary Statement" — providing support for the suspicion that Mr. Feldman had used a large language model. (Dkt. #158 at 2 n.1; *see also* Dkt. #156 at 2-6).

Mr. MacMull detailed not only the errors he observed in the Affable brief, but also his efforts to get Mr. Feldman to correct them. Before submitting his letter to the Court, Mr. MacMull had emailed Mr. Feldman on June 22, 2025, to notify him of the citation errors and to express concern about his potential misuse of an AI large language model. (Dkt. #158 at 2, 158-1 at 8-10). Mr. MacMull requested that Mr. Feldman file a letter with the Court by 5:00 p.m. the next day withdrawing Affable's motion and brief and explaining to the Court his reasons for doing so. (Dkt. #158 at 2, 158-1 at 9). If he did not, Mr. MacMull said that ethical obligations would require Top's attorneys to report their concerns to the Court. (Dkt. #158-1 at 9).

Mr. Feldman did not comply with Mr. MacMull's request. Rather, he replied to Mr. MacMull's email the next day, offering a convoluted excuse for the errors (one that he would later repeat to the Court) and claiming that he was "unable to verify certain citations" due to discontinued access to certain legal research databases. (Dkt. #158-1 at 7-8). Specifically, Mr. Feldman explained that he drew some of his brief's citations "from a repository of many cases I've compiled," some of which he "originally gathered during my initial research in December 2024, when I had broader access to legal databases, including Casetext with CoCounsel." (*Id.* at 7). But, Mr. Feldman said, after Thomson Reuters acquired Casetext and integrated it into Westlaw, "I

discontinued my subscription due to the prohibitive cost of maintaining

access." (*Id.*).  This was how Mr. Feldman excused his failure to independently

verify the accuracy of his citations:  "As a result, I was — and remain — unable

to verify certain citations that appeared in Casetext searches or Westlaw-only

formats, particularly during final revisions." (*Id.* at 7-8).

Mr. Feldman added that he also used "public search engines and internal

tools" — including vLex, which "includes some AI functionality" — to assist

with "citation formatting and cross-checking." (Dkt. #158-1 at 8).  The

problem, he reiterated, was that "these tools do not verify Westlaw citations

and did not flag the inaccuracies." (*Id.*).  Nevertheless, and with full knowledge

of these shortcomings, Mr. Feldman chose to "accept[ ] suggested citation

formats or assum[e] that references matched cases in my repository, without

realizing they were incorrect." (*Id.*).

Mr. Feldman expressed "regret" for these mistakes to Mr. MacMull, and

claimed that he would "replac[e] those citations with alternative authorities,"

but offered no timeline for doing so. (Dkt. #158-1 at 8).  And he asked Mr.

MacMull to "share the list of results you compiled" — a perplexing request,

given that Mr. MacMull's initial email had listed each erroneous citation — and

to "run the attached confidential brief," which he believed would "correct the

issues identified." (*Id.* at 8).

Mr. MacMull refused to "run" Affable's brief, a request he (and the Court)

interpreted to be for Top to conduct a cite check of Affable's brief. (Dkt. #158-1

at 6).  Mr. MacMull also expressed confusion at Mr. Feldman's request that he

"share the list of results" he had already shared.  (*Id.* at 6, 9-10).  Finally, Mr. MacMull commented that while Mr. Feldman did not commit to a time by which he would correct his brief, "[i]n the spirit of what [h]e underst[oo]d to be [Mr. Feldman's] intention to advise the Court of [his] conduct," Mr. MacMull would provide Mr. Feldman one additional day to notify the Court.  (*Id.* at 6).  Minutes after Mr. MacMull sent this email, Mr. Feldman called him to continue pressing the idea that Top should review a draft of Mr. Feldman's new brief before he filed it with the Court.  (Dkt. #158 at 2).  Mr. MacMull again refused.  (*Id.*).

The following day, on June 24, 2025, Mr. Feldman emailed Mr. MacMull and stated that he had "already notified opposing counsel and the Court that I am addressing the citation issues and will file a corrected memorandum as soon as possible."  (Dkt. #158-1 at 6).  That statement was false.  The Court was first notified of Mr. Feldman's errors by Mr. MacMull's June 26, 2025 letter.  (*See* Dkt. #158, 169 at 4-5).  Also in his email, Mr. Feldman claimed to be correcting the errors in his brief, but he still refused to provide any timeline by which he would do so.  (Dkt. #158-1 at 6).

In response, Mr. MacMull observed that there was no evidence that Mr. Feldman had ever notified the Court, so he requested proof.  (Dkt. #158-1 at 5).  Mr. Feldman sent back a nonsensical reply: "Opposing counsel and will inform the court.  Thanks for catching that."  (*Id.* at 4-5).  When Mr. MacMull sought clarification, Mr. Feldman responded gruffly.  (*Id.* at 2-4).  He criticized Mr. MacMull for declining to review his new draft for citation errors, while at the

same time reiterating his request for help. (*Id.* at 3). Somewhat ironically, Mr. Feldman directed Mr. MacMull to review the New York Rules of Professional Conduct, "particularly those addressing respect and courtesy among counsel." (*Id.*). Mr. MacMull rightly concluded that further communication with Mr. Feldman was "not productive" (*id.* at 1), and submitted his letter notifying the Court of Mr. Feldman's errors (Dkt. #158).

### C.    The Court Issues an Order to Show Cause, and Mr. Feldman Responds

After reviewing Mr. MacMull's letter, the Court expressed its dismay that Mr. Feldman might have used a large language model to generate a brief containing citations to cases that did not exist or were plainly incorrect. (Dkt. #159). Noting Mr. Feldman's professional obligation to read and confirm the existence and validity of the legal authorities on which he relied, especially when using a large language model, the Court ordered Mr. Feldman to show cause by July 10, 2025, why Affable's brief should not be stricken from the docket and sanctions imposed on him pursuant to Federal Rule of Civil Procedure 11. (*Id.* (citing *Park* v. *Kim*, 91 F.4th 610, 615-16 (2d Cir. 2024))).

On July 11, 2025 — one day after the deadline — Mr. Feldman submitted his written response to the Order to Show Cause. (Dkt. #164 ("Response")). The Response contained six requests, including requests for leave to withdraw Affable's motion to dismiss papers and replace them with corrected filings and for the Court to refrain from striking the motion or imposing sanctions on Mr. Feldman. (*Id.* at 7).

The Response was also noteworthy for its conspicuously florid prose.  For example, it featured an extended quote from Ray Bradbury's *Fahrenheit 451* and metaphors comparing legal advocacy to gardening and the leaving of indelible "mark[s] upon the clay."  (Response 3).  And it included the following passage:

> Your Honor, in the ancient libraries of Ashurbanipal, scribes carried their stylus as both tool and sacred trust — understanding that every mark upon clay would endure long beyond their mortal span.  As the role the mark (x) in Ezekiel Chapter 9, that marked the foreheads with a *tav* (x) of blood and ink, bear the same solemn recognition: that the written word carries power to preserve or condemn, to build or destroy, and leaves an indelible mark which cannot be erased but should be withdrawn, let it lead other to think these citations were correct.
>
> I have failed in that sacred trust.  The errors in my memorandum, however inadvertent, have diminished the integrity of the record and the dignity of these proceedings.  Like the scribes of antiquity who bore their stylus as both privilege and burden, I understand that legal authorship demands more than mere competence — it requires absolute fidelity to truth and precision in every mark upon the page.

(*Id.* at 7-8).  Needless to say, Mr. Feldman's overwrought metaphors and historical references raised the Court's eyebrows.

Flycatcher quickly opposed Affable's request to submit revised papers (Dkt. #165), which prompted Mr. Feldman to file a July 14, 2025 reply to Flycatcher's opposition that differed markedly in style from his Response to the Court's Order to Show Cause.  (*See* Dkt. #166 (the "July 14 Letter"); *see also* Dkt. #169 at 2).  The sharp change in tenor only heightened the Court's concern that Mr. Feldman was placing undue reliance on generative AI in his

submissions to the Court.  The first paragraph of the July 14 Letter is riddled with mistakes and broken prose.  (*See* Dkt. #166 at 1).  It is nine lines long but comprises just a single run-on sentence.  (*Id.*).  It contains capitalization errors. (*Id.*).  It reads in full:

> We write in response to the July 11, 2025 letter (ECF 165) from Plaintiffs ("Flycatcher"), counsel Tal S. Benschar, Esq. which opposes Defendant Affable Avenue LLC's request (ECF 164) *inter alia* to file corrected briefing and supporting materials *inter-alia* in connection with its motion to dismiss and compel arbitration, now heightened by the recent events which bring factual matters implied in the complaint, to the fore, in the current dealings with Amazon, which are a direct result of the factual matter presented in the complaint, which wish to arbitrate fully with amazon and flycatcher, and alternatively have dismissed as against those it has failed to meet the pleading standards, heightened in light of the specific allegations of criminal and illicit conduct stolen goods and NY penal law 165.66, etc., upon which it basis its causes of actions with *specificity*, as it must.

(*Id.*).  This stark contrast between Mr. Feldman's Response and the July 14 Letter led the Court to further scrutinize both documents, which uncovered yet another problematic citation.

In his Response, Mr. Feldman had contrasted his conduct with the misconduct described in two (real) cases: *Mata* v. *Avianca, Inc.*, 678 F. Supp. 3d 443 (S.D.N.Y. 2023), and *Park*, 91 F.4th 610.  (Response 3-4).  Mr. Feldman appeared to quote from the *Mata* decision, but failed to provide a pin cite:

> Critically, unlike the pattern of deception identified in *Mata*, where sanctions were imposed not merely for citing fictitious cases but for the attorneys' "*failure to be forthcoming, withdraw the prior submissions, and continue to give legitimacy to fake cases in the subsequent submissions despite having multiple reasons*

> *to believe that the cases lacked authenticity*," I immediately acknowledged the errors upon notification and undertook comprehensive corrective action within twenty-four hours.

(*Id.* at 4 (emphasis added)).  In point of fact, this quote appears nowhere in *Mata*.  A Google search revealed it to be a direct quote from an October 24, 2023 article recapping an analysis of *Mata* done by an attorney named Christopher F. Lyon.  *Christopher F. Lyon Delves into Risks of ChatGPT in Legal Field for NYLitigator*, Goldberg Segalla (Oct. 24, 2023), https://www.goldberg segalla.com/blog/professional-liability-matters/technology-2/christopher-f-lyon-delves-into-risks-of-chatgpt-in-legal-field-for-nylitigator/.  Mr. Feldman did not attribute the quote to this article.

On July 18, 2025, the Court issued an Order analyzing Mr. Feldman's recent submissions and expressing concerns about his AI misuse.  (Dkt. #169 at 1-3).  The Court denied Affable leave to withdraw and replace its mistake-riddled motion to dismiss documents.  (*Id.* at 3).  And it reserved decision on whether to strike Affable's brief and impose sanctions on Mr. Feldman; instead, it scheduled a conference for Mr. Feldman to explain himself.  (*Id.* at 6 ("The Court wants to hear directly from Mr. Feldman, so that it can give him the opportunity to — as he puts it — 'prove [himself] worthy to carry the stylus once more in service of justice and truth.'" (quoting Response 8)); Dkt. #174 (setting final conference date of August 22, 2025)).  The Court made clear, however, that it would not tolerate further derelictions of Mr. Feldman's professional responsibilities:

> Mr. Feldman must know how to verify that a case exists on Westlaw without the added benefit of AI tools. He claims that, going forward, he will undertake certain "remedial efforts," including, *inter alia*, "establish[ing] … database reconciliation procedures involving resolution of discrepancies through direct consultation of archival legal resources and substitution of alternative, verifiable authorities where necessary." (Response 5). Most lawyers simply call this "conducting legal research." All lawyers must know how to do it. Mr. Feldman is not excused from this professional obligation by dint of using emerging technology.

(Dkt. #169 at 4).

## D.    Mr. Feldman Commits Further Citation Errors

On August 8, 2025, Mr. Feldman decided to file a letter requesting leave to submit a reply brief in further support of Affable's pending motion to dismiss the TAC. (Dkt. #179). In connection with the letter request, he also filed the proposed reply brief itself. (Dkt. #180). On August 11, 2025, the Court denied Mr. Feldman's request without prejudice to its oral renewal at the August 22, 2025 conference. (Dkt. #181).

More bad news quickly followed for Mr. Feldman. Mr. MacMull submitted yet another letter alerting the Court to yet another citation error, this time in Mr. Feldman's proposed reply brief. (Dkt. #182). In attempting to explain why Flycatcher's claim under New York General Business Law ("GBL") § 349 failed, Mr. Feldman framed Flycatcher's argument as "relying on *Himmelstein* [v.] *Comcast of the D.C., LLC*, 908 F.3d 49 (D.C. Cir. 2018), aff'g 44 F. Supp. 3d 1 (D.D.C. 2012)." (Dkt. #180 at 11; *see also* Dkt. #182). But as Mr. MacMull observed and the Court later confirmed, neither of these cases exists. (Dkt. #182). The citation "908 F.3d 49" leads to a page in an opinion

from the United States Court of Appeals for the Fourth Circuit affirming a criminal conviction and sentence. *See United States* v. *Camara*, 908 F.3d 41, 49 (4th Cir. 2018). The citation "44 F. Supp. 3d 1" relates to a decision from the United States District Court for the District of Columbia ("D.D.C.") addressing the Humane Society's application to intervene in defense of a rule re-defining the statutory phrase "retail pet stores," which rule was promulgated by the United States Department of Agriculture pursuant to the federal Animal Welfare Act. *See Associated Dog Clubs of N.Y. State* v. *Vilsack*, 44 F. Supp. 3d 1 (D.D.C. 2014).

The case Mr. Feldman meant to cite is *Himmelstein, McConnell, Gribben, Donoghue & Joseph, LLP* v. *Matthew Bender & Co., Inc.*, 37 N.Y.3d 169 (2021), which actually discusses GBL § 349. (*See* Dkt. #183 (Feldman confirming his intent to cite this case)). The parties, including Mr. Feldman himself, had previously cited to it in their pre-motion letters and briefing. (Dkt. #129 at 3 n.4 (using the proper North Eastern Reporter citation); Dkt. #139 at 2; Dkt. #151 at 26; Dkt. #167 at 16; Dkt. #177 at 12). The Court therefore found it odd that Mr. Feldman could fail to properly cite this case, when he and others had successfully cited to it in earlier briefs — especially because Mr. Feldman's reply brief pin-cited to the pages of Flycatcher's brief where Flycatcher properly cited the case. (*See* Dkt. #180 at 11 (citing Dkt. #167 at 16-19)).

Mr. Feldman attempted to explain this error in a letter filed in the early-morning hours of August 12, 2025, but only dug himself a deeper hole. (Dkt. #183). He maintained that the incorrect *Himmelstein* citation was a "clerical

error" that was "introduced during a final verification of the citation string while double checking and preparing the citations and table of authorities." (*Id.* at 1). To substantiate his explanation, Mr. Feldman attached a copy of the correct *Himmelstein*, which he claimed to have downloaded from vLex the evening prior to submitting his reply brief. (*Id.*). Mr. Feldman also included a screenshot of a Google Scholar search for "himmelstein consumer," which contained three results. (*Id.*). The first was the correct *Himmelstein* citation; the second was a denial of a motion for re-argument on that correct *Himmelstein* case; and the third was an unrelated case called "*Himmelstein* v. *Comcast of the Dist., LLC*, 931 F. Supp. 2d 48 - Dist. Court, Dist. of Columbia, 2013":



(*Id.*).

Mr. Feldman offered this screenshot and pointed to the third result to argue that "it is without question that the citation [included in his reply brief] does exist." (Dkt. #183). Significantly, however, while the third result is a real case citation, the citation does not match the one in Mr. Feldman's reply brief. As for the case name, the reply brief cited "*Himmelstein* [v.] *Comcast of the D.C., LLC*," but the screenshot returns a result for "*Himmelstein* v. *Comcast of the Dist., LLC*." (Dkt. #180 at 11 (emphasis added); Dkt. #183 at 1 (emphasis added)). As for the reporter citation, the reply brief cited, in relevant part, 44 F. Supp. 3d 1 (D.D.C. 2012), but the screenshot showed a citation for 931 F. Supp. 2d 48 (D.D.C. 2013). What is more, even without reading the case appearing as the third result (which the Court views as the baseline), it should give any reasonable lawyer pause to cite a federal case from the D.D.C. while discussing New York state law. Indeed, as it turns out, this third result is a Fair Credit Reporting Act case and makes no mention of GBL § 349. *Himmelstein* v. *Comcast of the Dist., L.L.C.*, 931 F. Supp. 2d 48 (D.D.C. 2013).[2]

In this letter, Mr. Feldman flagged for the Court the "significant challenge" he and many other practitioners face accessing unreported citations. (Dkt. #183 at 1-2; *see also id.* at 3 ("[I]t should not be assumed that everyone has access to the walled garden[s] of Westlaw or Lexis." (emphasis omitted)). While technically true, the statement was also a red herring: The correct *Himmelstein* case Mr. Feldman should have cited is a reported New York Court

---

[2]    The screenshot undermines Mr. Feldman's credibility for yet another reason. The top two results show the correct *Himmelstein* case and a case related to it, which Mr. Feldman should have located rather than landing on the problematic third case.

of Appeals case, and other briefing in this action had already cited it, including Mr. Feldman's own pre-motion letter (Dkt. #139) and Flycatcher's brief to which Mr. Feldman pin-cited. The Court was therefore mystified by Mr. Feldman's pattern of submitting erroneous citations and his meandering explanations for his conduct. (Dkt. #185 at 4). It directed him not to file further explanations on the docket and warned him that it was considering a range of sanctions against him and Affable, including default judgment in Flycatcher's favor. (*Id.*).

### E.    The Sanctions Conference and the Court's Findings of Fact

On August 22, 2025, the Court held a conference to discuss Mr. Feldman's conduct. It set out to understand how his citation errors came to be and to what extent he used AI assistance to generate his submissions to the Court. The Court began by placing Mr. Feldman under oath (Dkt. #223 ("Tr.") at 4-5) and then proceeded to ask him a series of questions. While Mr. Feldman did admit to relying on AI to a degree (*see id.* at 39-40, 68-69, 72), he failed to fully accept responsibility. His answers grew increasingly discursive and were often entirely unresponsive to the Court's inquiries. (*See, e.g., id.* at 17 ("The Court: Sir, you are not answering my question. Mr. Feldman: I'll get to that."); *id.* at 34 ("Sir, once again, I'm really just asking you to answer my questions[.]"); *id.* at 36 ("I keep asking you, and I'm not sure why you are refusing to answer me."); *id.* at 37 ("Sir, you are not answering my question. I'm not sure how many ways I can ask it."); *id.* at 42 ("But you are still not answering my questions, which is getting to the point of being frustrating.")).

Mr. Feldman struggled to make eye contact with the Court and described an approach to legal research that was redolent of Rube Goldberg. Leaving the conference without clear answers, the Court was left to draw its own conclusions, which it sets forth in the remainder of this section.

### 1.    Affable's Brief in Support of Its Motion to Dismiss

Taking each of Mr. Feldman's three problematic submissions in turn, the Court began with questions about Affable's brief in support of its motion to dismiss. Mr. Feldman offered essentially two explanations for how the brief's citation errors came to be. First, they were the product of AI "hallucinations," *i.e.*, erroneous or non-existent legal authorities. (Tr. 51-52). The Court buys this first explanation; indeed, it is the only explanation the Court credits.[3] Mr. Feldman's second explanation was that the citation errors resulted from his idiosyncratic research process, which involved inserting into his brief unreported cases located via Google Scholar, Google search, or the AI-assisted platform vLex, and then cite-checking those cases by running the brief through a different AI program — either vLex or Paxton AI. (*Id.* at 37, 47-53). This automated cite check, Mr. Feldman said, introduced citation errors that he mistook as corrections and thus neither reviewed nor fixed. (*Id.* at 52-53). The Court does not find the second explanation credible, largely because it is not coherent. To that end, the Court will now attempt to flesh out Mr. Feldman's

---

[3]    It was not, however, an explanation that Mr. Feldman was eager to concede. (*See* Tr. 47 (The Court: "[Y]ou were saying to me, or you were saying to Mr. MacMull, that some of these cases are the product of hallucinations. Did you not say that? Mr. Feldman: I don't remember if I said that.")).

description of his research process, but doing so is a difficult task because he offered multiple, often inconsistent explanations.

In the beginning, Mr. Feldman drew from "two different repositories" of cases. (Tr. 13).  One repository consisted of electronic folders containing copies of cases or snippets of cases that he had collected over the last few years.  (*Id.* at 22-23).  The other repository contained "all the cases that were cited in the pre[-]motion briefing."  (*Id.* at 13).  Mr. Feldman sourced these cases through various methods, including Casetext, which, at the time he had access to it, provided "the largest available data set," including "Westlaw private citators" and other unpublished cases.  (*Id.* at 15-16).  But Thomson Reuters later purchased Casetext, and by the end of December 2024, Mr. Feldman no longer had access.  (*Id.* at 15-18).

In consequence, by the time Mr. Feldman was contemplating a motion to dismiss and preparing his pre-motion letter in the instant case, he was using Google Scholar and vLex (the latter a tool with AI components) to research cases.  (Tr. 25-26).  vLex, Mr. Feldman explained, is an "affordable" research tool offered through the New York State Bar Association.  (*Id.* at 27).  And while it "has some limited research capabilities," "it does not have good citation capabilities."  (*Id.*).  In particular, vLex "only provided … a certain part of the actual citation, not the full citation."  (*Id.*).  As a result, whenever Mr. Feldman conducted a vLex search, he would then have to take "another step, which is check citation or cite check."  (*Id.*).  But "sometimes" vLex provided "full" citations "embedded in cases."  (*Id.* at 28).  In those instances, Mr. Feldman

"trusted" the full citations and did not conduct an independent cite check. (*Id.*).

To cite check, if "it was a large case" or submission "where [he] had more time," Mr. Feldman would go to a bar association law library and use the publicly-available Westlaw or Lexis accounts. (Tr. 27-28, 30). Mr. Feldman claimed that such a situation — in which he would do his own "second check" — included writing "an actual brief." (*Id.* at 28, 30). But, in fact, this second check did not always occur at the law library using Westlaw or Lexis. Rather, Mr. Feldman would "often" use "Google Scholar as a cite button" by "enter[ing] the … case name" into it. (*Id.* at 28-29). And if that search yielded an unreported case with only a Westlaw citation available, he preferred not to use the Westlaw citation or "the non-official citation that Google uses" and instead tried to find another case citing the unreported case. (*Id.* at 30-31; *id.* at 32 ("I would try to find another case that cites to that case for that proposition."); *see also id.* at 45 (explaining that, for "an unofficial citation," "I prefer not to use" a "citation to the civil case docket")).

Mr. Feldman recognized the shortcomings of cite checking by Google Scholar. He acknowledged that "[s]ometimes the case names would not be the same because not all reporters report cases the same way." (Tr. 29). But he elided the more critical point that case names are distinct from reporter citations. (*Id.*). Similarly, Mr. Feldman conceded in part the problem with reverse-engineering a citation to an unreported case. In response to the Court's concern that this approach "tells you what some other court thought

the case said, but that[ ] [it is] not a legitimate way of cite checking or doing research," Mr. Feldman agreed: "Absolutely.  It's definitely not.  I would parse that out." (*Id.* at 31).  But Mr. Feldman's response told the Court nothing about how he "parse[d] that out."  And he was unable to provide a better answer upon further questioning.  Instead, he doubled down and suggested that the way he would assure himself of the validity of a citation to an unreported case was to find further cases citing that unreported case. (*Id.* at 32).

To be sure, there is nothing wrong with this approach on its own; reviewing other authorities that each cite and interpret the same case is part of prudent legal research.  The problem is that another, indispensable element of legal research is to read the underlying case itself.  *See Park*, 91 F.4th at 615. And that Mr. Feldman did not do.

Mr. Feldman acknowledged that before submitting his motion to dismiss brief, he "didn't have the time" to go to the law library. (Tr. 36).  Without access to Westlaw or Lexis, he first went to vLex, then Google Scholar and Google search. (*Id.* at 37).  After eventually locating cases via Google, Mr. Feldman submitted his brief to three rounds of review by AI programs.  First, he "ran some of the arguments through vLex." (*Id.* at 48).  "And then subsequently, [he] went through a cite checker," Paxton AI. (*Id.*).  Finally, he "ran [the brief] through AI to check again." (*Id.*).  At some point in that automated review process, Mr. Feldman surmised, AI introduced the citation errors. (*Id.*).  At no point did Mr. Feldman himself cite check the brief. (*Id.*

("The Court:  You didn't fully cite check the brief, before you submitted it to me.

Mr. Feldman:  Correct, I did not.")).

Mr. Feldman acknowledged this failing, while at the same time offering a

confusing justification:

> It wasn't the — the citation that I used, I would not rely
> on the citations when I was first searching the cases.
> So if I cited to a case that cited to another case, I may
> have cited to a case that was not — I may have referred
> to, not cited, but I referred to that case.  When I went to
> check to see the case and find the case, I mistakenly
> used the citation that did — that, one, the citation did
> not exist, and two, the citation that I used was not the
> same citation.

(Tr. 44).  In short, Mr. Feldman acknowledged ending up with citations that

"did not exist," but failed to provide a coherent explanation as to how.  Was the

error a product of AI hallucination from the initial drafting stage?  Was it

somehow a case name mismatch on Google Scholar (setting aside the greater

importance of the reporter citation)?  Did another case improperly cite Mr.

Feldman's case, accidentally supplying him the wrong citation?  Did an AI

program introduce errors at the cite-check stage where none had existed

previously?  Representative of much of his colloquy with the Court, Mr.

Feldman's explanations were thick on words but thin on substance.

The Court informed Mr. Feldman that his responses were not helping it

"figure out how one-quarter of your cases were nonexistent hallucinations."

(Tr. 33).  In another moment representative of Mr. Feldman's general approach

to the conference, he attempted to minimize his responsibility by correcting the

Court: "Fourteen out of 60 cited cases."  (*Id.*).  The Court recognizes the

mathematical truism that 14 out of 60 is less than one-quarter, but the fundamental point remains that it is 14 fake cases too many. The Court therefore concludes that Mr. Feldman misused AI in preparing his motion to dismiss brief by generating nonexistent citations in some instances and misattributing quotes in others, without ever properly verifying and correcting these issues.

### 2. The Response to the Order to Show Cause

Proceeding to Mr. Feldman's Response to the Court's Order to Show Cause, the Court observes that Mr. Feldman admitted to using AI, but only to "review the content" of his submission. (Tr. 68; *see also id.* at 72 ("I used generative AI to confirm that the information that I wrote was correctly referencing the information that I had.")). The tool he claimed to use was NotebookLM. (*Id.* at 68). In drafting the Response, he decided to strip away most citations and make the submission "more of a personal letter," but he claimed to have nevertheless done his "own research." (*Id.* at 63-64). The Court finds that explanation extremely difficult to believe given his out-of-left-field invocation of the ancient libraries of Ashurbanipal and his reference to *Fahrenheit 451*.

Even were the Court to credit Mr. Feldman's explanation for the marked shifts in prose among his submissions, his explanation of the *Mata* citation issue does not add up. Mr. Feldman claimed he "went through the ... *Mata* case," but then removed the citation and meant to remove the quotations marks too but forgot. (Tr. 63-66). That makes no sense because his Response

quoted an article about *Mata*, not *Mata* itself.  When the Court confronted him with that inconsistency, he quickly pivoted: "I wanted to cite to the literature that was out there." (*Id.* at 65).  But, of course, Mr. Feldman did not do that either.  Mr. Feldman then claimed that he was citing to the article all along and in fact originally included a citation to it.  (*Id.*).  Incomprehensibly, though, he decided in the end to remove any citation at all.  The Court sees things differently:  AI generated this citation from the start, and Mr. Feldman's decision to remove most citations and write "more of a personal letter" (*id.* at 63) is nothing but an *ex post* justification that seeks to obscure his misuse of AI and his steadfast refusal to review his submissions for accuracy.[4]

### 3.    The Proposed Reply Brief

Turning to the third problematic submission, the proposed reply brief, the Court again finds that Mr. Feldman's account did not make sense.  He explained that his cite-check process this time was to take "out all the cases that [he] cited to and put them into an Excel spreadsheet." (Tr. 74).  Then, he checked "every single case" by going to PACER and downloading them.  (*Id.*).  He claimed he "already had" the *Himmelstein* case because he had downloaded it in the past, so this time he was just "going through each citation making

---

[4]    The Court's other problem with Mr. Feldman's discussion of the Response merits only a footnote.  Mr. Feldman claims to have written every word in the document other than quotes or paraphrases (Tr. 69), but the Court struggles to believe him.  Mr. Feldman's written submissions are pockmarked with grammatical errors.  The Response, by contrast, has far fewer grammatical issues than his other submissions, and has a tone unlike any of his other submissions.

sure the citation was correct," not reviewing the "substance" of the cases. (*Id.* at 75-76).

From there, Mr. Feldman's explanation went off the rails. He said two things at once: (i) he took the screenshot of the Google Scholar search after he wrote the reply brief and only included it in his early-morning letter as evidence that the *Himmelstein* case in fact existed, and (ii) while writing the reply brief, he conducted this Google Scholar search, or at least one like it, received multiple hits for *Himmelstein*, and blew past the first two results and went with the third. (Tr. 80-83). These explanations are mutually inconsistent, and the second one describes behavior that is difficult for the Court to wrap its head around, given that Mr. Feldman was already on clear notice that the Court was closely scrutinizing his citations. The simplest answer is often the best one, and here the Court concludes that it is also the truth: Mr. Feldman used AI to produce this citation and then failed to verify it.

In sum, the Court finds that Mr. Feldman misused AI in three separate filings, which resulted in the submission of nonexistent cases and misattributed quotes. Although Mr. Feldman at times purported to claim full responsibility for the errors (*see* Tr. 52 ("I'm saying they are my fault regardless.")), he undermined this acceptance of responsibility by repeatedly minimizing his behavior and offering improbable explanations.

# DISCUSSION

## A.    Applicable Law

In this case, the Court draws its authority to impose sanctions from two sources, Federal Rule of Civil Procedure 11 and its inherent judicial powers. *First*, "[a]ll counsel that appear before [the court] are bound to exercise professional judgment and responsibility, and to comply with the Federal Rules of Civil Procedure." *Park*, 91 F.4th at 614.  Rule 11(b)(2) provides that by presenting a submission to the court, an attorney "certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances … the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law." Fed. R. Civ. P. 11(b)(2).  In other words, "Rule 11 imposes a duty on attorneys to certify that they have conducted a reasonable inquiry and have determined that any papers filed with the court are well grounded in fact, [and] legally tenable[.]"  *Cooter & Gell* v. *Hartmarx Corp.*, 496 U.S. 384, 393 (1990).

At a minimum, then, attorneys must "read, and thereby confirm the existence and validity of, the legal authorities on which they rely." *Park*, 91 F.4th at 615.  Otherwise, they cannot "ensure that the arguments made based on those authorities are 'warranted by existing law,' or … 'legally tenable.'"  *Id.* (citation omitted) (first quoting Fed. R. Civ. P. 11(b)(2); then quoting *Cooter & Gell*, 496 U.S. at 393).  Stated simply, "[a] fake opinion is not 'existing law,'" and an "attempt to persuade a court or oppose an adversary by relying on fake

opinions is an abuse of the adversary system."  *Id.* (quoting *Mata*, 678 F. Supp. 3d at 461).

An attorney who violates Rule 11 subjects himself and his client to sanctions.  *See* Fed. R. Civ. P. 11(c); *Park*, 91 F.4th at 614-16; *Muhammad* v. *Walmart Stores E., L.P.*, 732 F.3d 104, 108 (2d Cir. 2013) (per curiam); *United States* v. *Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL-CIO*, 948 F.2d 1338, 1343 (2d Cir. 1991).  A court may impose those sanctions on its own initiative after ordering the attorney or party "to show cause why conduct specifically described in the order has not violated Rule 11(b)" and providing "notice and a reasonable opportunity to respond."  Fed. R. Civ. P. 11(c)(1), (3).  A court has discretion to fashion sanctions as it deems "appropriate," but they "must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated."  Fed. R. Civ. P. 11(c)(1), (4); *see also* Fed. R. Civ. P. 11(c)(5) (imposing some "[l]imitations on [m]onetary [s]anctions").  A court should also be mindful to impose Rule 11 sanctions "with restraint," *Storey* v. *Cello Holdings, L.L.C.*, 347 F.3d 370, 387 (2d Cir. 2003) (quoting *Schlaifer Nance & Co.* v. *Est. of Warhol*, 194 F.3d 323, 334 (2d Cir. 1999)), because it may be acting "as accuser, fact finder and sentencing judge," *Mackler Prods., Inc.* v. *Cohen*, 146 F.3d 126, 128 (2d Cir. 1998).

*Second*, a court may also "exercise its inherent power to sanction a party or an attorney who has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'"  *Ransmeier* v. *Mariani*, 718 F.3d 64, 68 (2d Cir. 2013)

(quoting *Chambers* v. *NASCO, Inc.,* 501 U.S. 32, 45-46 (1991)); *see also*
*Sussman* v. *Bank of Israel,* 56 F.3d 450, 459 (2d Cir. 1995) ("A court has the
inherent power to supervise and control its own proceedings and to sanction
counsel or a litigant for bad-faith conduct."); *Goodyear Tire & Rubber Co.* v.
*Haeger*, 581 U.S. 101, 107 (2017) (explaining that federal courts' inherent
powers include "the ability to fashion an appropriate sanction for conduct
which abuses the judicial process" (quoting *Chambers,* 501 U.S. at 44-45)); *see*
*generally Rossbach* v. *Montefiore Med. Ctr.*, 81 F.4th 124, 141 (2d Cir. 2023).
One of the sanctions available to a court under its inherent powers is the
ability to enter default judgment against the offending party.  *See Abraham* v.
*Leigh*, No. 17 Civ. 5429 (KPF), 2023 WL 6811647, at *9-10 (S.D.N.Y. Oct. 16,
2023), *aff'd*, 2025 WL 1500835 (2d Cir. May 27, 2025); *see also Chambers*, 501
at 45 ("[O]utright dismissal of a lawsuit … is a particularly severe sanction, yet
is within the court's discretion.").

Because "a sanction that has the effect of ending the case and granting
judgment to one of the parties" is such a "harsh" remedy, "it should be imposed
only in the most extreme of circumstances."  *Abraham*, 2023 WL 6811647, at
*9 (quoting *LifeTree Trading Pte., Ltd.* v. *Washakie Renewable Energy, LLC*,
No. 14 Civ. 9075 (JPO), 2017 WL 2414805, at *2 (S.D.N.Y. June 2, 2017));
*accord Sanchez* v. *Litzenberger*, No. 09 Civ. 7207 (THK), 2011 WL 672413, at *5
(S.D.N.Y. Feb. 24, 2011).  Accordingly, in considering terminal sanctions,
courts generally weigh five factors:

> (i) whether the misconduct was the product of intentional bad faith; (ii) whether and to what extent the misconduct prejudiced the injured party; (iii) whether there is a pattern of misbehavior rather than an isolated instance; (iv) whether and when the misconduct was corrected; and (v) whether further misconduct is likely to occur in the future.

*Abraham*, 2023 WL 6811647, at *9-10 (quoting *Passlogix, Inc.* v. *2FA Tech., LLC*, 708 F. Supp. 2d 378, 394 (S.D.N.Y. 2010)); *see also Sanchez*, 2011 WL 672413, at *4-5 (explaining that "[c]ourts in this Circuit consider [these] five factors in determining whether to impose the sanction of dismissal" and collecting cases).[5]  "[B]asic principles of due process" also require that before a court sanctions an attorney, it must provide notice (including of the authority under which sanctions are being considered) and an opportunity to be heard. *Wilson* v. *Citigroup, N.A.*, 702 F.3d 720, 725 (2d Cir. 2012).

As a unifying principle, to impose sanctions under either source of authority, a court must find subjective bad faith.  *See Mata*, 678 F. Supp. 3d at 462 (first citing *Muhammad*, 732 F.3d at 108; then citing *Int'l Bhd. of*

---

[5]    *See also Shepherd* v. *Annucci*, 921 F.3d 89, 97-98 (2d Cir. 2019):

> We have repeatedly stated that dismissal is a harsh sanction that requires a district court to at least consider lesser remedial measures before imposing that sanction. *See, e.g., Selletti* v. *Carey*, 173 F.3d 104, 111 (2d Cir. 1999) (explaining that before a district court dismisses an action for failure to comply with a court order it must consider, among other things, "a sanction less drastic than dismissal"); *Dodson* v. *Runyon*, 86 F.3d 37, 39 (2d Cir. 1996) ("The remedy [of dismissal] is pungent, rarely used, and conclusive. A district judge should employ it only when he is sure of the impotence of lesser sanctions." (internal quotation marks omitted)). Failure to consider a lesser sanction than dismissal is generally an abuse of discretion. *See In re Harris*, 464 F.3d 263, 272 (2d Cir. 2006) ("Dismissing the [case] without determining whether a lesser sanction would have been appropriate ... was an abuse of discretion.").

27

*Teamsters*, 948 F.2d at 1345) (observing that sanctions imposed either *sua sponte* under Rule 11 or under court's inherent powers require finding of bad faith).  "Subjective bad faith is 'a heightened *mens rea* standard' that is intended to permit zealous advocacy while deterring improper submissions." *Id.* (quoting *In re Pennie & Edmonds LLP*, 323 F.3d 86, 91 (2d Cir. 2003)).

A court can find subjective bad faith in various ways.  The knowing and intentional submission of a false statement of fact constitutes bad faith, as does claiming knowledge despite knowing that one in fact does not have such knowledge.  *Mata*, 678 F. Supp. 3d at 462-63.  "Any notice or warning provided to the attorney is relevant to a finding of bad faith," *id.* at 462, and a court can infer bad faith where the action is "completely without merit," *In re 60 E. 80th St. Equities, Inc.*, 218 F.3d 109, 116 (2d Cir. 2000).  Relatedly, confusion does not preclude a finding of bad faith.  *Mata*, 678 F. Supp. 3d at 463 (citing *United States ex rel. Hayes* v. *Allstate Ins. Co.*, 686 F. App'x 23, 28 (2d Cir. 2017) (summary order) ("[C]onfusion about corporate complexities would not justify falsely purporting to have personal knowledge as to more than sixty defendants' involvement in wrongdoing.")).  Finally, a court can impute bad faith based on circumstantial evidence and conscious avoidance, *id.*, the latter of which occurs when a person is aware of the high probability of that a fact exists but consciously avoids learning or confirming it, *United States* v. *Svoboda*, 347 F.3d 471, 477, 480 (2d Cir. 2003).

It is also worth noting Rule 3.3(a)(1) of the New York Rules of Professional Conduct, which states: "A lawyer shall not knowingly … make a

false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer." N.Y. Rules of Prof. Con. 3.3(a)(1); *see also Park*, 91 F.4th at 614 (invoking Rule 3.3(a)(1) in case involving nonexistent citations generated by AI); *Mata*, 678 F. Supp. 3d at 460 (same).

## B.    Analysis

The Court has devoted so much time to limning the procedural history of this case to make a point: Mr. Feldman was not dissuaded by Court orders or the threat of sanctions from filing unchecked, AI-generated submissions with false legal citations. And when given the opportunity to explain his conduct in person, Mr. Feldman chose to give many answers, only a few of which were true. The Court has reviewed the options available to it and, in particular, has carefully considered whether a lesser sanction would suffice. It also wishes to be clear that its problems with Affable's submissions are not the use of AI *per se*, but rather Mr. Feldman's (i) knowing decision to use flawed methods of legal research and cite-checking; (ii) his inexplicable refusal to verify his submissions before filing them with the Court; and (iii) his unwillingness to come clean once these issues were revealed to the Court. Ultimately, the length and breadth of Mr. Feldman's misconduct warrant terminal sanctions.

### 1.    Because Mr. Feldman Acted in Bad Faith, the Court Imposes Terminal Sanctions

Mr. Feldman violated Rule 11 repeatedly and brazenly, despite multiple warnings from the Court and fellow counsel. In his motion to dismiss brief, Mr. Feldman submitted documents containing fake cases and misattributed

quotes hallucinated by AI.  Then, when the Court called him out for this behavior and ordered him to show cause why it should not sanction him for misusing AI in violation of Rule 11, he relied on AI to draft the Response.  The Court can forgive the abrupt shift in tone and the irrelevant historical references; what it cannot forgive is Mr. Feldman's inclusion of another faulty citation and his persistent failure to verify his citations.  And as further proof that he had learned nothing from his interactions with the Court, Mr. Feldman spontaneously submitted a proposed reply brief containing yet another nonexistent case while awaiting a hearing on the Order to Show Cause.

The Court put Mr. Feldman on notice that it believed his conduct violated Rule 11 (Dkt. #159) and that it was considering "a range of sanctions against him," including default judgment (Dkt. #185).  But at no point did the Court's warnings deter him; he continued to submit fake cases and erroneous citations to the Court.  Even when confronted with pointed questioning from the Court during the sanctions conference, he remained unable to accept full responsibility and admit his mistakes.

The Court finds that Mr. Feldman's AI misuse resulting in erroneous citations, exacerbated by his insouciant approach to cite-checking, was done in bad faith.  He knew, or consciously avoided learning, that the cases he cited were not "warranted by existing law," Fed. R. Civ. P. 11(b)(2), or "legally tenable," *Cooter & Gell*, 496 U.S. at 393.  In particular, the Court finds that Mr. Feldman either knew or was aware of the high probability that using AI as he did would generate faulty citations.  *See Svoboda*, 347 F.3d at 477, 480.  The

Court determines that he knew of this risk when writing his motion to dismiss brief. And the Court explicitly told him of this risk before he submitted his Response and reply brief.

The Court recognizes that the imposition of terminal sanctions is an extraordinary step. *See Abraham*, 2023 WL 6811647, at *9. It is not one the Court takes lightly or eagerly. But Mr. Feldman's repeated misdeeds were themselves extraordinary. The Court has weighed the five factors relevant when considering terminal sanctions. It has already explained that Mr. Feldman's "misconduct was the product of intentional bad faith." *Id.* at 10. This misconduct "prejudiced" the Court and other parties to the case, who have all expended significant resources investigating and responding to Mr. Feldman's faulty submissions. *Id.* This "misbehavior" was a "pattern." *Id.* Indeed, the most remarkable element of Mr. Feldman's misconduct — and a significant reason why the Court is defaulting his client — is his continuous pattern of behavior. He kept submitting erroneous citations and kept refusing to check his citations despite ample warning from the Court to do so or face sanctions, and despite his own admission that he had a viable means to access Westlaw and Lexis to conduct a cite check. Mr. Feldman never "corrected" his "misconduct" either. *Id.* He claims he did (*see* Tr. 88 ("I will endeavor to continue to correct [the errors.]")), but his repeated misbehavior and minimization of responsibility say otherwise. Finally, Mr. Feldman has given the Court every reason to believe that "further misconduct is likely to occur in the future." *Abraham*, 2023 WL 6811647, at *10. He has offered no

convincing plan to take ameliorative action.  Rather, from the jump he has
claimed that he would fix his mistakes, but he never has.  (*See* Dkt. #158-1 at
7-8 (Mr. Feldman telling Mr. MacMull he would correct his motion to dismiss
brief but offering no timeline for doing so)).

By Mr. Feldman's own telling, he did not check his citations but instead
fed them through AI programs.  (Tr. 37, 48 (Mr. Feldman explaining that he
located cases via Google and then ran them through three rounds of AI review);
*see also* Dkt. #158-1 at 7-8 (Mr. Feldman informing Mr. MacMull that he is
simply "unable to verify certain citations")).  So even if the Court did credit
every word of Mr. Feldman's explanation of the drafting process of his
submissions (and it does not), he would still have violated Rule 11 by
submitting cases without reading them.  *Park,* 91 F.4th at 615 ("At the very
least, the duties imposed by Rule 11 require that attorneys read, and thereby
confirm the existence and validity of, the legal authorities on which they rely.").
Mr. Feldman claimed to have been pressed for time (Tr. 36, 42), but that does
not excuse an attorney from his obligations — nor a client from its attorney's
misdeeds, *see Link* v. *Wabash R.R. Co.*, 370 U.S. 626, 634 (1962) ("[E]ach party
is deemed bound by the acts of his lawyer-agent" and cannot "avoid the
consequences of [its lawyer's] acts or omissions.").  If Mr. Feldman could not
verify a citation, he should not have cited it.

Accordingly, pursuant to Rule 11 and its inherent powers, the Court
enters default judgment against Mr. Feldman's client, Affable, and finds this
sanction is "limited to what suffices to deter repetition of the conduct or

comparable conduct by others similarly situated." Fed. R. Civ. P. 11(c)(4).  The assessment of damages will await the disposition of the matter as to the remaining Defendants.

Finally, Mr. MacMull requested leave "to make a fee application pursuant to either a violation of Rule 11(b) and/or 28 U.S.C. [§] 1927." (Tr. 95).  The Court grants him permission to do so because it has found that Mr. Feldman acted in bad faith, *Chambers*, 501 U.S. at 45 (explaining that courts may assess attorneys' fees when party has acted in bad faith), and it agrees that Mr. Feldman has "multiplie[d] the proceedings in [this] case unreasonably and vexatiously," 28 U.S.C. § 1927.

## CONCLUSION

For the foregoing reasons, the Court SANCTIONS Mr. Feldman by entering default judgment as to his client, Defendant Affable Avenue LLC.  The Clerk of Court is directed to strike docket entries 153 through 156 and to enter judgment in favor of Plaintiffs and against Affable Avenue LLC.  Mr. MacMull is ORDERED to submit his application for attorneys' fees as to Mr. Feldman within 30 days of this Opinion.

SO ORDERED.

Dated:    February 5, 2026
          New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge