UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FLYCATCHER CORP. LTD and FLYCATCHER TOYS, INC.,<br><br>Plaintiffs,<br><br>-v.-<br><br>OZMOS COMPANY LLC; EYTAN GROSSMAN, *doing business as* EYG DEALS; CREATIVE REWARDS INC.; JOSHUA CHAVEZ, *doing business as* ONESTOPFASTSHOP; VALLEY BODEGA WHOLESALE INC.; SAM SHAMLOO; ADAM HAMIDA; and JOHN DOES 1 to 25,<br><br>Defendants. | 24 Civ. 9429 (KPF)<br><br>**OPINION AND ORDER** |

KATHERINE POLK FAILLA, District Judge[1]:

The Court hoped that it had issued its last opinion addressing the conduct of Steven A. Feldman, counsel to now-defaulted Defendant Affable Avenue LLC ("Affable"). But "Mr. Feldman has not, and apparently cannot, learn from his mistakes." *Flycatcher Corp.* v. *Affable Ave. LLC*, No. 24 Civ. 9429 (KPF), 2026 WL 306683, at *1 (S.D.N.Y. Feb. 5, 2026) ("Sanctions Op."). On February 5, 2026, the Court sanctioned him for "repeatedly and brazenly" violating Federal Rule of Civil Procedure 11 by submitting false citations to the Court produced by generative artificial intelligence ("AI") and then lying about their genesis. *Id.* at *12. Finding that Mr. Feldman had acted in bad faith, the

[1] The Clerk of Court is directed to modify the caption of the case as shown above. In particular, the Court has previously entered default judgment as to the following Defendants, who should be terminated from the docket: Pretty Princess LLC, Ayanee LLC, Fortuna KG LLC, Joan Alexander Soriano, Moda Original LLC, S&N Global Supply Inc., and Value Valley Wholesale LLC.

Court imposed terminal sanctions on Affable. *Id.* at *1, *12-14. The Court also authorized Joel G. MacMull, then-counsel to Defendant Top Experience Company LLC ("Top"), who had provided substantial assistance to the Court by investigating and reporting Mr. Feldman's misconduct, to file a petition for attorneys' fees and costs.

Following the Court's February 5, 2026 decision, Mr. MacMull contacted Mr. Feldman directly in an effort to efficiently resolve the fee award. But, consistent with his general approach to this litigation, Mr. Feldman gave Mr. MacMull the runaround. After recognizing the inutility of further negotiations with Mr. Feldman, Mr. MacMull prepared and submitted a detailed fee petition that reflected, among other things, the substantial additional time spent on the matter after the issuance of the Court's decision. He now seeks $43,086.59 in attorneys' fees and costs. For the reasons explained below, the Court grants Mr. MacMull's request, less a 10% reduction to the attorneys' fees component, for a total award of $38,877.59.[2]

2 Mr. MacMull's petition seeks attorneys' fees and costs on behalf of Top. (Dkt. #245 at 1; Dkt. #287 at 1). But Mr. MacMull (and his partner Brian Block) have since withdrawn as counsel to Top (Dkt. #324), and the Court entered default judgment as to Top on September 28, 2026 (Dkt. #358). Accordingly, the Court refers to the fee petition as Mr. MacMull's — not Top's — and awards the fees and costs to him and his firm, Mandelbaum Barrett PC. The Court understands that, to the extent that Top has previously paid the fees sought in Mr. MacMull's motion, the firm will reimburse Top from the award ordered in this Opinion.

## BACKGROUND[3]

### A. Factual Background

The Court assumes familiarity with its February 5, 2026 Sanctions Opinion. There, the Court limned its reasons for concluding that Mr. Feldman had acted in bad faith and that his misconduct necessitated sanctions pursuant to Rule 11 and the Court's inherent judicial powers. Sanctions Op., at *10-14. In consequence, the Court imposed a default judgment as to Affable and granted Mr. MacMull's request to make a fee application pursuant to Rule 11 and 28 U.S.C. § 1927, the latter after finding that Mr. Feldman had acted in bad faith and "multiplied the proceedings in this case unreasonably and vexatiously." *Id.* at *14 (alterations adopted) (quoting 28 U.S.C. § 1927).

In the wake of the Court's Sanctions Opinion, on February 13, 2026, Mr. MacMull emailed Mr. Feldman in an attempt to resolve the amount of fees due without the need for further Court intervention. (MacMull Decl., Ex. C at 11-12). Mr. MacMull's exploratory email advised Mr. Feldman that his fees to that point totaled $15,553.75, as set forth in the invoices attached to that email (*see id.*, Ex. A and B), and further advised that Mr. MacMull was prepared to accept $13,998.37 — a 10% discount — payable within thirty days to avoid the very

[3] For ease of reference, the Court refers to Mr. MacMull's memorandum of law in support of his motion for attorneys' fees as "MacMull Br." (Dkt. #245); to Mr. Feldman's memorandum of law in opposition to Mr. MacMull's motion for attorneys' fees as "Feldman Opp." (Dkt. #285); and to Mr. MacMull's reply memorandum of law in support of his motion for attorneys' fees as "MacMull Reply" (Dkt. #287). As appropriate, the Court also relies on the declarations of Mr. MacMull in support of his motion for attorneys' fees and the exhibits attached thereto. (Dkt. #244 ("MacMull Decl., Ex. [ ]"); Dkt. #288 ("MacMull Reply Decl., Ex. [ ]")).

attorneys' fees motion now before the Court. (*Id.*, Ex. C at 11-12). Mr. MacMull also informed Mr. Feldman that if he were forced into motion practice, he would seek an award of fees incurred to prepare his fee application (so-called "fees on fees"). (*Id.*). Mr. MacMull gave Mr. Feldman until February 17, 2026, to accept his offer. (*Id.*).

Mr. MacMull would, however, quickly come to regret contacting Mr. Feldman, because Mr. Feldman's responses were as abstruse as his prior communications with Mr. MacMull and with the Court. *See* Sanctions Op., at *2-10. His first response, on February 17, 2026, was a terse, one-sentence request for "a detailed invoice to review." (MacMull Decl., Ex. C at 11). But that request made no sense; Mr. MacMull's initial email had already attached his invoices. (*Id.*, Ex. C at 11-12; *see also id.*, Ex. A and B). Indeed, this response was evocative of Mr. Feldman's initial response to Mr. MacMull's original email to him in June 2025 identifying his AI-hallucinated citations. There, Mr. Feldman asked Mr. MacMull to "share the list of results you compiled[,]'" which was "a perplexing request, given that Mr. MacMull's initial email had listed each erroneous citation." Sanctions Op., at *2 (internal quotation marks and citation omitted).

Mr. Feldman's subsequent emails with Mr. MacMull regarding a potential resolution of the fees issue were no more productive. Mr. Feldman gestured at resolving the issue without briefing, but only under his terms. He proposed to pay Mr. MacMull's fees in monthly installments of $1,500 while continuing to demand "a single, proper invoice in standard form" — notwithstanding that Mr.

MacMull had already sent him "three redacted invoices and a February pre-bill identifying the amounts to which [Mr. MacMull was] entitled." (MacMull Decl., Ex. C at 9-10).

Mr. MacMull responded that he was not comfortable with a "10+ month[ ]" payment timeline and refused "to burden [his] bookkeeping department with drafting up a new invoice to [Mr. Feldman]." (MacMull Decl., Ex. C at 8). Instead, Mr. MacMull proposed an alternative path forward: three monthly installments of $5,000. (*Id.*). But Mr. Feldman refused, reiterating his demand for "a consolidated, itemized fee statement sufficient to permit meaningful review and payment." (*Id.*, Ex. C at 7). And in a subsequent email, he again asked Mr. MacMull to "[p]lease send me your invoice" (which, of course, Mr. MacMull had already done), lest he "seek leave from the Court to deposit the full $15,553.75 with the Honorable Judge Failla, as applicable, under FRCP 67 and Local Civil Rule 67.1, or otherwise post a bond, to avoid the unnecessary prolixity of motion practice under Rule 11 for the purpose of obtaining 'fees on fees.'" (*Id.*, Ex. C at 6).

Mr. Feldman's seeming willingness to pay an upfront lump sum lulled Mr. MacMull into believing that motion practice could be forestalled. (*See* MacMull Decl., Ex. C at 5). But in light of Mr. Feldman's propensity for equivocation, Mr. MacMull sought to pin Mr. Feldman down by asking him a very direct set of questions — essentially inquiring, in plain terms, (i) whether Mr. Feldman would agree to pay the fees upfront or, alternatively, in three monthly installments, (ii) whether he would agree to jointly submit to the Court

a consent order memorializing such an agreement, and (iii) in the most obvious effort at appeasement, whether Mr. Feldman would accept "a simple letter … invoicing [him] for the amount." (*Id.*, Ex. C at 4).

True to form, Mr. Feldman responded elliptically to the three questions. He stated that he was "not in a position to pay a single lump sum." (MacMull Decl., Ex. C at 3). As for Mr. MacMull's more substantive inquiries concerning the proposed consent order and his position that failure to reach an agreement would necessitate the instant motion, Mr. Feldman mused:

> Regarding the "Consent Order," I do not agree to this requirement. I am prepared to provide these payments as a satisfaction of the fee issue to avoid further motion practice, but I will not enter into a public order or a settlement agreement involving a release of any claims. If you require security, I remain willing to post a bond or deposit the funds with the Court under FRCP 67, which would fully secure your fees without the need for a public directive should you persist with such vexatious conduct same will be presented pursuant to rule 11. I remind you that the inherent powers of the court are in equity not in law, as such you vitiate your claims for equitable relief, by "moving" the court and at the same time acting capriciously. I am giving you a full and fair safe harbor, well in advance of the so ordered deadline.

(*Id.*). Mr. Feldman later characterized the "current impasse [a]s due solely to [Mr. MacMull]'s refusal to provide a standard invoice or a Form W-9 — basic administrative prerequisites for any lawful disbursement — and [his] insistence on a public 'Consent Order' rather than a private satisfaction of the fee issue." (*Id.*, Ex. C at 1). These characterizations beggar logic: Mr. MacMull never requested a release of any claims, and a W-9 was not required to reach an agreement in principle on the amount of fees Mr. Feldman would pay.

**B. Procedural Background**

Declining to throw good money after bad (*see* MacMull Decl., Ex. C at 2 ("[Y]ou seem incapable of answering simple questions. … [Y]ou've now exhausted our patience entirely.")), Mr. MacMull ceased his discussions with Mr. Feldman and turned to preparing his application to the Court for attorneys' fees and costs. He filed his fee petition and supporting documents on March 6, 2026. (Dkt. #243-245). After the Court granted Mr. Feldman an extension of time to submit his opposition (Dkt. #252), he did so on April 20, 2026 (Dkt. #285). Mr. MacMull replied on April 27, 2026. (Dkt. #287-88).

**DISCUSSION**

**A. Applicable Law**

Because the Court has already determined that Mr. MacMull is entitled to attorneys' fees pursuant to Rule 11 and 28 U.S.C. § 1927, Sanctions Op., at *14, it now need only determine the reasonable attorneys' fees that Mr. Feldman must pay him.

Attorneys' fees are typically awarded by determining the "presumptively reasonable fee," often (if imprecisely) referred to as the "lodestar." *Millea* v. *Metro-N. R.R. Co.*, 658 F.3d 154, 166 (2d Cir. 2011) (internal quotation marks omitted) (quoting *Arbor Hill Concerned Citizens Neighborhood Ass'n* v. *County of Albany*, 522 F.3d 182, 183 (2d Cir. 2008)); *see also Perdue* v. *Kenny A. ex rel. Winn*, 559 U.S. 542, 552-53 (2010); *Rossbach* v. *Montefiore Med. Ctr.*, No. 19 Civ. 5758 (DLC), 2021 WL 4940306, at *1 (S.D.N.Y. Oct. 22, 2021) ("When a court imposes a monetary sanction against a party in the amount of its

adversary's attorneys' fees, the familiar lodestar method is used to calculate the appropriate sum."), *aff'd in part and vacated in part on other grounds*, 81 F.4th 124 (2d Cir. 2023). The lodestar is calculated by multiplying the "reasonable hourly rate and the reasonable number of hours required by the case." *Millea*, 658 F.3d at 166.

Courts may, only after the initial calculation of the presumptively reasonable fee, adjust the total when it "does not adequately take into account a factor that may properly be considered in determining a reasonable fee." *Lilly* v. *City of New York*, 934 F.3d 222, 230 (2d Cir. 2019) (internal quotation marks omitted) (quoting *Millea*, 658 F.3d at 167).[4] A district court possesses considerable discretion in awarding attorneys' fees. *See Millea*, 658 F.3d at 166; *Arbor Hill*, 522 F.3d at 190.

"To determine the reasonable hourly rate for each attorney, courts must look to the market rates 'prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation.'" *Heng*

---

[4] The Second Circuit confirmed in *Lilly* v. *City of New York*, 934 F.3d 222 (2d Cir. 2019), that while this Circuit has adopted the lodestar approach for fee determinations, the 12 factors set forth in *Johnson* v. *Ga. Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974), *abrogated on other grounds by*, *Blanchard* v. *Bergeron*, 489 U.S. 87 (1989) — which articulated a competing method for fee determinations — "remain important tools for helping district courts calculate the lodestar and, in exceptional cases, determining whether an enhancement or cut to the lodestar is warranted." *Lilly*, 934 F.3d at 233. These 12 factors are: (i) the time and labor required; (ii) the novelty and difficulty of the questions; (iii) the level of skill required to perform the legal service properly; (iv) the preclusion of employment by the attorney due to acceptance of the case; (v) the attorney's customary hourly rate; (vi) whether the fee is fixed or contingent; (vii) the time limitations imposed by the client or the circumstances; (viii) the amount involved in the case and results obtained; (ix) the experience, reputation, and ability of the attorneys; (x) the "undesirability" of the case; (xi) the nature and length of the professional relationship with the client; and (xii) awards in similar cases. *Arbor Hill Concerned Citizens Neighborhood Ass'n* v. *County of Albany*, 522 F.3d 182, 186 n.3 (2d Cir. 2008) (citing *Johnson*, 488 F.2d at 717-19).

*Chan* v. *Sung Yue Tung Corp.*, No. 03 Civ. 6048 (GEL), 2007 WL 1373118, at *2 (S.D.N.Y. May 8, 2007) (quoting *Gierlinger* v. *Gleason*, 160 F.3d 858, 882 (2d Cir. 1998)). The Second Circuit's "forum rule" requires courts to "generally use the hourly rates employed in the district in which the reviewing court sits in calculating the presumptively reasonable fee." *Simmons* v. *N.Y.C. Transit Auth.*, 575 F.3d 170, 174 (2d Cir. 2009) (internal quotation marks omitted) (quoting *Arbor Hill,* 493 F.3d at 119). At bottom, "[t]he presumptively reasonable fee boils down to 'what a reasonable, paying client would be willing to pay,' given that such a party wishes 'to spend the minimum necessary to litigate the case effectively.'" *Id.* (quoting *Arbor Hill,* 493 F.3d at 112, 118).

"A district court has discretion to determine a reasonable hourly rate based on considerations such as the complexity of the case, the prevailing rates in similar cases in the district, and the quality of representation." *Pasini* v. *Godiva Chocolatier, Inc.*, 764 F. App'x 94, 95 (2d Cir. 2019) (summary order) (citing *Townsend* v. *Benjamin Enters., Inc.*, 679 F.3d 41, 59 (2d Cir. 2012)); *accord Lilly*, 934 F.3d at 231-32. In this setting, "the district court does not play the role of an uninformed arbiter but may look to its own familiarity with the case and its experience generally as well as to the evidentiary submissions and arguments of the parties." *Bliven* v. *Hunt*, 579 F.3d 204, 213 (2d Cir. 2009) (internal quotation marks omitted) (quoting *DiFilippo* v. *Morizio*, 759 F.2d 231, 236 (2d Cir. 1985)).

When determining the reasonable number of hours, a court must make "a conscientious and detailed inquiry into the validity of the representations

that a certain number of hours were usefully and reasonably expended." *Haley* v. *Pataki*, 106 F.3d 478, 484 (2d Cir. 1997) (internal quotation marks omitted) (quoting *Lunday* v. *City of Albany*, 42 F.3d 131, 134 (2d Cir. 1994) (per curiam)). In addition, the court should examine the hours expended by counsel with a view to the value of the work product to the client's case. *See Lunday*, 42 F.3d at 133-34. The court is to exclude "excessive, redundant or otherwise unnecessary hours, as well as hours dedicated to severable unsuccessful claims." *Quaratino* v. *Tiffany & Co.*, 166 F.3d 422, 425 (2d Cir. 1999).

In determining whether hours are excessive, "the critical inquiry is 'whether, at the time the work was performed, a reasonable attorney would have engaged in similar time expenditures.'" *Samms* v. *Abrams*, 198 F. Supp. 3d 311, 322 (S.D.N.Y. 2016) (quoting *Grant* v. *Martinez*, 973 F.2d 96, 99 (2d Cir. 1992)). Where "the billing records are voluminous, it is less important that judges attain exactitude, than that they use their experience with the case, as well as their experience with the practice of law, to assess the reasonableness of the hours spent." *Yea Kim* v. *167 Nail Plaza, Inc.*, No. 05 Civ. 8560 (GBD) (GWG), 2009 WL 77876, at *4 (S.D.N.Y. Jan. 12, 2009) (internal quotation marks omitted) (quoting *Alveranga* v. *Winston*, No. 04 Civ. 4356 (ARR) (CLP), 2007 WL 595069, at *5 (E.D.N.Y. Feb. 22, 2007)); *see also Fox* v. *Vice*, 563 U.S. 826, 838 (2011) (observing that "[t]he essential goal in shifting fees ... is to do rough justice, not to achieve auditing perfection"). A court retains the discretion to make across-the-board percentage reductions to exclude

unreasonable hours, colloquially referred to as "trimming fat." *E.g.*, *In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 226, 237 (2d Cir. 1987); *accord McDonald ex rel. Prendergast* v. *Pension Plan of the NYSA-ILA Pension Tr. Fund*, 450 F.3d 91, 96 (2d Cir. 2006).

The burden is on the fee applicant — here, Mr. MacMull — to "document[ ] the appropriate hours expended and hourly rates." *Dancy* v. *McGinley*, 141 F. Supp. 3d 231, 235 (S.D.N.Y. 2015) (internal quotation marks omitted) (quoting *Hensley* v. *Eckerhart*, 461 U.S. 424, 437 (1983)). Requested fees "must be supported with contemporaneous time records establishing for each attorney for whom fees are sought, the date on which work was performed, the hours expended, and the nature of the work done." *Abdell* v. *City of New York*, No. 05 Civ. 8453 (RJS), 2015 WL 898974, at *2 (S.D.N.Y. Mar. 2, 2015) (internal quotation marks omitted) (quoting *Sprint Commc'ns Co. L.P.* v. *Chang*, No. 13 Civ. 3846 (RA), 2014 WL 6611484, at *6 (S.D.N.Y. Nov. 21, 2014)). "[C]ounsel … [are] not required to record in great detail how each minute of [their] time was expended," but "counsel should identify the general subject matter of [their] time expenditures." *Hensley*, 461 U.S. at 437 n.12.

**B. Analysis**

On behalf of his firm, Mr. MacMull seeks $42,090.00 for 73.2 hours of attorney time billed and $996.59 in Westlaw legal research fees. (MacMull Decl. ¶¶ 7, 10, 13; *id.*, Ex. A and B; MacMull Reply Decl. ¶¶ 3-4; *id.*, Ex. A; MacMull Reply 1; *id.* at 5 (agreeing to write off "two minor entries totaling 1.1

hours")). The hours incurred include time spent responding to Mr. Feldman's misconduct underlying the Court's Sanctions Opinion (24.1 hours), as well as preparing the attorneys' fees opening and reply briefs (37.1 and 12 hours respectively). (MacMull Decl., Ex. A and B; MacMull Reply Decl., Ex. A; *see also* MacMull Reply 5).[5] As explained below, the Court will impose on the attorneys' fees component of this figure a 10% across-the-board, fat-trimming reduction, and award Mr. MacMull a total of $38,877.59 in attorneys' fees and costs.

Mr. MacMull's requested fees reflect the work that he and his partner at Mandelbaum Barrett, Mr. Block, performed. Each billed at a rate of $575 per hour (MacMull Decl. ¶¶ 6, 9), which was "a significantly discounted rate that was provided to Top" (MacMull Br. 9). In total, Mr. MacMull billed 54.6 hours, and Mr. Block billed 19.7 hours. (MacMull Decl. ¶¶ 7, 10; *id.*, Ex. A and B; MacMull Reply Decl. ¶¶ 3-4; *id.*, Ex. A; *see also* MacMull Reply 5, 8 (later agreeing to cut 1.1 hours)). Employing the lodestar method, the Court finds that these rates and hours are generally reasonable.

To begin, Mr. MacMull's and Mr. Block's rates are reasonable in light of their positions, experience, and the prevailing rates in this District. Mr. MacMull, "Top's lead counsel" (MacMull Br. 9), is a partner at Mandelbaum Barrett and Chair of the firm's Intellectual Property, Brand Management, and Internet Law Group (MacMull Decl. ¶ 4). He has been practicing law since

---

[5] The 37.1 hours figure includes the time spent with Mr. Feldman attempting to stave off motion practice.

2005, has tried to verdict and judgment numerous trademark cases across the country, and was a member of a three-attorney team that successfully litigated a Lanham Act case before the United States Supreme Court, *Matal* v. *Tam*, 582 U.S. 218 (2017). (MacMull Decl. ¶¶ 4-5). Mr. Block is also a partner at Mandelbaum Barrett and has been practicing law since 2014. (*Id.* ¶ 8). He previously clerked for Justice Anne M. Patterson of the Supreme Court of New Jersey. (*Id.*).

Prevailing rates in this District demonstrate that counsel's hourly rate of $575 is reasonable. *See Kulick* v. *Gordon Property Group, LLC*, No. 23 Civ. 9928 (KPF), 2026 WL 2453598, at *31 (S.D.N.Y. Aug. 21, 2026) (holding that partner's rate of $715 was reasonable and collecting cases); *Carrington* v. *Graden*, No. 18 Civ. 4609 (KPF), 2020 WL 5758916, at *11-15 (S.D.N.Y. Sept. 28, 2020) (finding reasonable hourly rates of up to $900 for partners and collecting cases); *Patsy's Brand, Inc.* v. *I.O.B. Realty, Inc.*, No. 99 Civ. 10175 (KMW), 2025 WL 3012879, at *2-3 (S.D.N.Y. Oct. 28, 2025) (finding 2024 rates for Mr. MacMull in the amount of $625 per hour and Mr. Block in the amount of $550 per hour "are well within the range of prevailing market rates for intellectual property litigation in the Southern District of New York"). Notably, Mr. Feldman does not contest the reasonableness of these rates. (*See* Feldman Opp.).

Counsel's hours are also reasonable. As mentioned, counsel seeks fees for 73.2 hours worked — 24.1 hours focused on Mr. Feldman's underlying misconduct (MacMull Decl., Ex. A; MacMull Reply 5, 8), 37.1 hours preparing

the opening brief in support of the motion for attorney's fees (MacMull Decl., Ex. B), and 12 hours spent preparing the reply (MacMull Reply Decl., Ex. A). *See also Reed* v. *A.W. Lawrence & Co.*, 95 F.3d 1170, 1183-84 (2d Cir. 1996) (holding that time spent working on a fee application is compensable).

Mr. Feldman contests the number of hours expended, advancing four arguments why the number is unreasonable. The Court addresses them in a different order than they were presented. *First*, Mr. Feldman argues that Mr. MacMull and Mr. Block, as partners, should have delegated certain tasks to more junior attorneys or support staff who would have charged less for their time. (Feldman Opp. 2, 5-7). Mr. MacMull counters that he "does not have any associates in his group." (MacMull Reply 8). More importantly, however, his and Mr. Block's significantly discounted rate of $575 is commensurate with rates that courts in this District have approved for associates. *See China AI Cap. Ltd.* v. *DLA Piper LLP (US)*, No. 21 Civ. 10911 (VM) (VF), 2025 WL 2466633, at *6-7 (S.D.N.Y. May 22, 2025) (approving higher-end rates of $550, $700, and $875 for mid-level and senior-level associates in Rule 11 sanctions case), *report and recommendation adopted*, No. 21 Civ. 10911 (VM), 2025 WL 3204368 (S.D.N.Y. Nov. 17, 2025); *MSC Mediterranean Shipping Co. Holding S.A.* v. *Forsyth Kownacki LLC*, No. 16 Civ. 8103 (LGS), 2017 WL 1194372, at *3 (S.D.N.Y. Mar. 30, 2017) (accepting hourly rates between $569.02 and $753.42 per hour for associates depending on seniority); *Flatiron Acquisition Vehicle, LLC* v. *CSE Mortgage LLC*, No. 17 Civ. 8987 (GHW), 2022 WL 413229, at *14 (S.D.N.Y. Feb. 9, 2022) (approving rates of between $405 and $660 for

associates in commercial case); *Kulick*, 2026 WL 2453598, at *31 (approving associates' hourly rates of $440 and $485 and collecting cases). In this respect, the partner title is immaterial; the hourly rate is what matters. Given the discounted rate here, which is on par with rates deemed reasonable for associates, Mr. Feldman's first argument falls flat.

*Second*, Mr. Feldman argues that his underlying misconduct did not affect Top, so "much of what Mandelbaum Barrett billed for was not necessary." (Feldman Opp. 2). But as Mr. MacMull points out in reply, as citation issues caused by generative AI proliferate across the country, courts depend on attorneys to bring to their attention other lawyers' faulty citations. (MacMull Reply 4 (citing, among others, *Dec* v. *Mullin*, 171 F.4th 940, 946-47 (7th Cir. 2026) (lamenting counsel's failure to catch and bring to court's attention opposing counsel's AI-hallucinated citations))). Moreover, the Court freely acknowledges the significant service that Mr. MacMull and Mr. Block provided it. In scrupulously investigating and reporting Mr. Feldman's misconduct, counsel quickly brought to the Court's attention a serious issue, unearthed details that might not have otherwise been available to the Court, and ultimately saved the Court a substantial amount of time in running down Mr. Feldman's misdeeds. For these reasons, the Court cannot agree that the time counsel spent investigating and reporting Mr. Feldman was "not necessary."

*Third*, Mr. Feldman takes issue with specific time entries, arguing that certain tasks were not necessary or took too long. (Feldman Opp. 4-7).

Generally speaking, the Court disagrees here as well. Having itself expended considerable time and energy unraveling Mr. Feldman's convoluted submissions, the Court understands all too well how time-intensive this process can be. But the Court recognizes that Mr. MacMull and Mr. Block billed more time to the fee issues that followed the Court's Sanctions Opinion and to preparing the fee petition than they did to identifying the AI problems with Mr. Feldman's briefing in the first instance. The possibility that this time could have been spent more efficiently is one reason why the Court will impose a 10% across-the-board reduction on the fee award.

The more important reason, however, is Mr. Feldman's fourth argument, which concerns his ability to pay. (*See* Feldman Opp. 2, 8-9). While Mr. Feldman offers no substantiation for his inability to pay, he apparently finds himself in this position — with a defaulted client and a substantial attorneys' fees penalty — at least in part because he was not able to afford access to expensive legal databases like Westlaw and Lexis. *See* Sanctions Op., at *6 (describing Mr. Feldman's concern about "the 'significant challenge' he and many other practitioners face accessing unreported citations," and his assertion that "'[i]t should not be assumed that everyone has access to the walled garden[s] of Westlaw or Lexis'" (second alteration in original) (citations omitted)). While the Court does not accept this as an excuse for his misconduct, *id.* at *13 ("If Mr. Feldman could not verify a citation, he should not have cited it."), it recognizes that for Mr. Feldman, a solo practitioner who

has indicated a certain degree of financial limitations, a roughly $40,000 penalty is substantial.

"Given the underlying purpose of sanctions — to punish deviations from proper standards of conduct with a view toward encouraging future compliance and deterring further violations — it lies well within the district court's discretion to temper the amount to be awarded against an offending attorney by a balancing consideration of his ability to pay." *Star Mark Mgmt., Inc.* v. *Koon Chun Hing Kee Soy & Sauce Factory, Ltd.*, 682 F.3d 170, 179 (2d Cir. 2012) (alteration adopted) (quoting *Oliveri* v. *Thompson*, 803 F.2d 1265, 1281 (2d Cir. 1986)). Thus, largely motivated by Mr. Feldman's limited ability to pay the full fees Mr. MacMull seeks, the Court determines that a 10% across-the-board reduction "serves to trim the fat." *Chakma* v. *Sushi Katsuei, Inc.*, No. 23 Civ. 7804 (KPF), 2026 WL 1399056, at *14 (S.D.N.Y. May 19, 2026) (citing *In re Agent Orange Prod. Liab. Litig.*, 818 F.2d at 237); s*ee also Kulick*, 2026 WL 2453598, at *31-32 (imposing 15% reduction where plaintiff offered some evidence suggesting that fee request of $43,044.25 was triple her annual income). This yields an attorneys' fees award of $37,881.00.

Finally, Mr. MacMull seeks $996.59 in legal research costs. "[A]ttorney's fees awards include those reasonable out-of-pocket expenses incurred by attorneys and ordinarily charged to their clients," *LeBlanc-Sternberg* v. *Fletcher*, 143 F.3d 748, 763 (2d Cir. 1998) (alteration in original) (internal quotation marks and citation omitted), and the Court will award that figure in full.

Accordingly, the Court determines that Mr. Feldman must pay Mr. MacMull and his firm $38,877.59 in attorneys' fees and costs.

**CONCLUSION**

For the foregoing reasons, the Court GRANTS IN PART Mr. MacMull's motion for attorneys' fees and costs and awards his firm $38,877.59. Such payment must be made by Mr. Feldman within 30 days of this Opinion, unless he and Mr. MacMull agree to a different schedule.

The Clerk of Court is directed to terminate the pending motion at docket entry 243 and is further directed to modify the caption of the case as shown above. Additionally, the Court previously granted Mr. MacMull's and Mr. Block's request to withdraw as counsel to Top but to remain on the docket while this motion for attorneys' fees remained pending. (Dkt. #324). Because the motion is now resolved, the Clerk of Court is further directed to terminate Mr. MacMull and Mr. Block from the docket.

SO ORDERED.

Dated: October 9, 2026
New York, New York

Katherine Polk Failla

KATHERINE POLK FAILLA
United States District Judge